HIRAM DWOSKIN, ALIAS HIRAM DEE, PLAINTIFF IN ERROR,
v. STATE OF NEBRASKA, DEFENDANT IN ERROR.

74 N. W. 2d 847

Filed February 10, 1956. No. 33815.

*Schrempp & Lathrop,* for plaintiff in error.

*Clarence S. Beck,* Attorney General, and *Homer G. Hamilton,* for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

The plaintiff in error, hereinafter called the defendant, was convicted of obtaining money by false pretenses and was sentenced to serve 4 years in the State Penitentiary. He brings the record of his conviction to this court for review.

The amended information, in substance, charged that Hiram Dwoskin, alias Hiram Dee, did falsely pretend to William L. Sudyka and Louella L. Sudyka that the Allied Finance System, a corporation, was the owner of or had the power to execute a conveyance of Lot 6, Block 4, Phillips' Addition to the city of Omaha, Douglas County, Nebraska, also described as 2419 South Tenth Street, Omaha, Nebraska; that by such false pretenses the defendant did induce William L. Sudyka and Louella

L. Sudyka to enter into a contract with the Allied Finance System and defendant for the purchase of said property and to pay to Allied Finance System and defendant the sum of $3,000 in money as a down payment on the purchase price of said property; that neither the Allied Finance System nor the defendant were the owners of said property; that neither the Allied Finance System nor defendant had any authority to contract for the sale of such property or the power to execute a conveyance of such property; that relying upon such false pretenses, William L. Sudyka and Louella L. Sudyka did pay and deliver $3,000 in money to the Allied Finance System and defendant; that the Allied Finance System and defendant received the $3,000 in money; and that such pretenses were false and made with the intent to defraud William L. Sudyka and Louella L. Sudyka.

The charge was brought under section 28-1207, R. R. S. 1943. So far as material here, the statute provides: "Whoever (1) by false pretense or pretenses, or by a promissory representation as to some future action to be taken by the person making the representation where made with the present intent that such future action would not be performed or carried out, shall obtain from any other person, * * * any money, * * * with intent to cheat or defraud such person, * * *." The statute then provides for punishment of the offense.

The gist of the offense is described in Brennan v. State, 141 Neb. 205, 3 N. W. 2d 217, as follows: " 'In a prosecution for obtaining money by false pretenses the gist of the offense consists in obtaining the money of another by false pretenses, with the intent to cheat and defraud.' Ketchell v. State, 36 Neb. 324, 54 N. W. 564; reaffirmed in Thompson v. State, 112 Neb. 389, 199 N. W. 806."

The defendant elected to try his own case. He was assisted, in part, by an attorney from the public defender's office.

At the close of the State's evidence, the defendant moved for a directed verdict of acquittal and predicates

error on the part of the trial court in overruling this motion. This raises the question of the sufficiency of the evidence to submit the case to the jury, which may be summarized as follows.

By stipulation of the parties, the Allied Finance System and the Equity Holding Company are Nebraska corporations. The evidence clearly indicates that the defendant was the sole and complete owner of these corporations, and there is no evidence to the contrary. We make this observation at this time for the reason that both the Allied Finance System and the Equity Holding Company will be mentioned subsequently in the opinion.

The record discloses that Leo J. Kemler and Lillian Kemler, his wife, acquired title to Lot 6, Block 4, Phillips' Addition to Omaha, Douglas County, Nebraska, by warranty deed from Jens Dahl Jensen and Marie Jensen, husband and wife, executed on March 5, 1951. The property is also known as 2419 South Tenth Street. Kemler testified that in March 1951, he entered into a contract for the construction of a house on the property, with the defendant, the Built-Rite Company, and paid the defendant $4,400, making the last payment around July 1951. In addition, he executed a mortgage to the Allied Finance System, a Nebraska corporation, on March 5, 1951, in the amount of $9,000. He dealt only with the defendant when he dealt with the Allied Finance System. A dispute arose between Kemler and the defendant apparently with reference to liens that might be placed against the property. As a result of this dispute, a contract was entered into between Kemler and his wife and the Allied Finance System on August 4, 1952. By the terms of the contract Kemler and his wife were to sell to the Allied Finance System the property in question for $5,500, the purchaser agreeing to buy the property subject to all encumbrances of record or any encumbrances that might be placed there-

after on the property, and to close the purchase on or before 90 days after the date of the agreement.

Kemler further testified that he never had any conversation, correspondence, or communication of any kind with the defendant or the Allied Finance System after August 4, 1952, or before December 6, 1952, with reference to William L. Sudyka and Louella L. Sudyka; that he never sold the property; and that he did not own it at the time of the trial.

On cross-examination Kemler testified that he was represented by an attorney, and that after August 4, 1952, his attorney had correspondence with the defendant with reference to the property in question. Kemler's attorney wrote a letter dated December 19, 1952, to the defendant in care of the Built-Rite Company, informing the defendant that the attorney had a deed to the property heretofore described, made by Leo J. Kemler and Lillian Kemler, husband and wife, conveying the property to the Allied Finance System, and would deliver the deed to the defendant upon the payment of $5,500, on condition that the amounts named in the letter were paid within a reasonable time, not to exceed 30 days from the date of the letter.

On January 30, 1953, Kemler's attorney wrote to the defendant referring to the attorney's letter of December 19, 1952, and stating that the purpose of the letter was to amend the letter of December 19, 1952, and informing the defendant that the deeds mentioned in that letter and the amounts specified were to be paid by February 15, 1953.

On re-direct examination Kemler testified that on or after February 15, 1953, he never executed any document with reference to the sale of this property to the defendant or the Allied Finance System, nor had any conversation with the defendant; that the option, as evidenced by the letters, was never exercised by the defendant; that he never received from the defendant or the Allied Finance System, or anybody else at any

time after December 6, 1952, any money from the sale of this property; that after the property was sold, his attorney received in Kemler's behalf a note from the defendant for $5,000; that Kemler received a total of $447.40 from the defendant; and that no further money was paid on this note.

William L. Sudyka testified that he contacted the defendant by a telephone call and made an appointment with him to look over the property in question as it had a "for sale" sign on it, by Built-Rite. The defendant did not keep the appointment, and 2 weeks later, on December 6, 1952, this witness called the defendant again and made an appointment to go to defendant's place on North Thirtieth Street. He met the defendant and asked him what he wanted for the property, and the defendant told him that he would have to have some money for a down payment. The witness said that he had $3,000. They then proceeded to the house and looked it over. The interior was not finished. The defendant said he wanted $14,900 for the house. After looking over the house this witness, his wife, and the defendant went to the defendant's place of business. The defendant then told this witness: "That is a nice place, * * * I will sell it to you, * * * I will fix it and I will have the floors in and the walls painted." He referred to the property as his house. He also said he would have it fixed up by January 1, 1953. Negotiations were carried on and a contract was entered into which was a purchase agreement whereby Sudyka and his wife agreed to purchase the property here involved from the Allied Finance System, the same to be completed in accordance with specifications which were designated on the reverse side of the contract, subject, however, and on condition that the owner thereof had a good and valid title, in fee simple, and would furnish abstract of title down to the date of the sale, and convey said premises by warranty deed, land contract for deed, the purchaser agreeing to pay $14,900, the terms

being $3,000 payment with contract and balance payable at the rate of $72 per month, together with interest on the unpaid balance. All payments made were to apply on interest first and the balance on the principal. Payments of $72 were to start February 1, 1953, and continue until the principal and interest were paid in full. Said property was to be delivered to purchaser free and clear of all encumbrances and taxes due and payable. Then the seller agreed to close the purchase in accordance with the contract, and the date was not designated when the closing would occur. There are other elements of the contract not necessary to mention, except that it shows that Sudyka, on December 6, 1952, paid $3,000 to apply on the purchase price of the property. A check for $3,000, dated December 6, 1952, payable to the Allied Finance System by William L. Sudyka, bearing the endorsement of the Allied Finance System is in evidence as the down payment on the property.

William Sudyka further testified that he believed and relied upon the defendant's representation and defendant's statement that he would sell the house to him; and that at no time during any of these transactions were the names of Mr. or Mrs. Kemler mentioned to him, nor that there was a mortgage on the property, nor that mechanic's liens had been filed against the property. It does appear from the evidence that during the period when the house was being constructed and prior to December 6, 1952, mechanic's liens in the amount of $3,974.07 had been filed against the property. He further testified that he made no payments on the house after December 6, 1952; that he did have a conversation with the defendant in February or March with reference to moving some furniture into the house; that the house was not finished and he did not move the furniture in; and that he did not receive a deed from the defendant or from the Allied Finance System, or receive any part of his money back.

The defendant proceeded to cross-examine this wit-

ness extensively, against the advice of his technical adviser or assistant. This cross-examination revealed very little, if anything, different from the testimony of the witness on direct examination, except to say that the defendant and the witness went to some loan companies to obtain a mortgage which they were unable to obtain, and that the witness' attorney told him not to move into the property.

Louella Sudyka corroborated and substantiated the testimony of her husband, William L. Sudyka, in every detail, and testified that she was with him at all times when he had any transactions with the defendant with reference to the property.

Warren Tunis testified without objection on the part of the defendant, contrary to the advice of his technical adviser or assistant. The testimony of this witness, and of the witness Julius Van Hoenacker which is summarized later, has reference to transactions between these witnesses and the defendant subsequent to the transaction with William L. Sudyka and Louella L. Sudyka, his wife. The court cautioned the jury that this type of testimony would be admitted for one purpose only, that is, with reference to the question of the intent on the part of the defendant in connection with the transaction in question, and the court instructed the jury to the same effect.

This witness testified that in October 1953, he had a conversation with the defendant at defendant's office. He looked at the property in question. The defendant told him it had been built for some time and the transaction did not go through, so it was available if the witness wanted to buy it; that he owned it and built it; and that he would also build a garage and arrange for a mortgage. The name of Kemler was never mentioned when the negotiations were entered into. Nothing was said by defendant about a mortgage or mechanic's liens at that time, nor about a lawsuit being filed to foreclose the liens against the property. On October 3,

1953, an agreement for a warranty deed was entered into by and between this witness and his wife and the Equity Holding Company, Inc., with reference to the purchase of the property in question for $14,900, cost of the house and land, and cost of new improvements and land $2,750, with a down payment of $1,000, and $200 a month. The $1,000 was paid down by this witness by check to the Equity Holding Company at the time of entering into the agreement. He never received a deed from the Equity Holding Company. He moved into the property, took possession, and lived there for a few weeks. On cross-examination by the defendant this witness testified that he endeavored to make cancellation of his agreement for failure on the part of the seller to perform the terms thereof, and adjusted the matter by receiving a refund of $850, allowing a fee for services rendered to date.

A deputy register of deeds testified to the deed from the Jensens to the Kemlers; that the next deed was dated on February 24, 1954; and that no other instrument was filed on that property during the interval of time between the recording of the Jensen-to-Kemler deed and February 24, 1954, with the exception of mechanic's liens and a mortgage.

Julius Van Hoenacker testified that he met the defendant while he was walking around the premises on a Sunday afternoon in the last part of December 1953, or the fore part of January 1954. The defendant and his son were working on the sunporch and invited the witness into the house. Later the defendant told the witness that he was in trouble. The defendant did not tell this witness who owned the property. He said nothing about any mechanic's liens, or about a lawsuit filed with reference to foreclosing some liens. An agreement was entered into January 22, 1954, between this witness and his wife, and the Equity Holding Company for the purchase of the premises for $12,000, $50 at the time the contract was signed, $4,950 on January 25,

1954, and $7,000 after the delivery of the deed. This witness further testified that he did not receive the deed to the premises from the defendant or the Equity Holding Company.

There is a stipulation in the record setting forth the dates of a number of mechanic's liens filed against the property in question on October 15, 1951, and in January, March, August, October, and November 1952. An action was brought to foreclose these liens. A decree of foreclosure was entered, sheriff's sale had, sale confirmed, and all the lienholders were foreclosed of all equity of redemption, right, title, interest in, or lien upon the real estate.

The defendant argues that the State failed to produce any evidence of the defendant's pretense that he had power to execute a conveyance. The evidence shows that the only connection the defendant had with the real estate in question prior to August 4, 1952, was that he contracted to build a house thereon for the owners. Thereafter a dispute arose between the owners and the defendant. On August 4, 1952, the owners and the defendant entered into a contract of purchase, giving the defendant the right to purchase the property within 90 days from the date of the contract. There was nothing said nor done with reference to the contract between the parties to the agreement prior to December 6, 1952. On that date the defendant contracted to sell the property to William L. Sudyka and Louella L. Sudyka, and took a $3,000 payment down. The contract between the defendant and the owners, by its terms, had expired on November 2, 1952. There was no extension of the contract giving the defendant an option to purchase the property from November 2, 1952, to December 6, 1952. The record discloses that there is no evidence that defendant ever intended to exercise the option to purchase the property as provided for by the contract. Obviously the defendant had no title, nor did the Allied Finance System, of any kind to the property involved in

this case on December 6, 1952. The defendant or the Allied Finance System were in no position to sell or contract to sell the property. This being true, the defendant or the Allied Finance System did not have the legal right or power on December 6, 1952, to execute a conveyance of the property to the Sudykas. The written contract of purchase entered into between the Sudykas and the Allied Finance System and defendant specified with reference to the property here involved "that the owner hereof has a good and valid title, in fee simple." The defendant told the Sudykas: "I will sell you my house * * *."

The defendant relies on Graf v. State, 118 Neb. 485, 225 N. W. 466. In that case Graf, defendant, and one Krauss entered into a contract for the exchange of properties. Pursuant thereto Krauss endorsed a note owned by him, secured by a chattel mortgage, and delivered the note and chattel mortgage to the defendant, and also delivered to defendant warranty deeds executed by Krauss and his wife on lands owned by him. At the same time the defendant executed and delivered to Krauss a warranty deed for the lands which defendant claimed he owned. At that time the defendant held a contract for the purchase of the lands he claimed he owned, and had paid thereon the sum of $500. A deed had been executed by the owner of the record title to this land, in which the defendant was named as grantee, and deposited in escrow, to be delivered to the defendant upon payment by him of the balance of the purchase price, amounting to $3,100. Some time after the making of the contract for and exchange of deeds between Krauss and defendant, the defendant voluntarily made payments aggregating more than $1,100 on his contract for the purchase of the land he had agreed and attempted to convey to Krauss. The court indicated that this evidence tended to negative the charge that the defendant had an intent to cheat or defraud, but stated it was a question for the jury. The court went on to what it

considered a more serious question—that it was charged in the information that the defendant represented that he was the owner and holder of the record title to the land which he was to convey to Krauss. The defendant did not state that he was the owner of the record title. At most, the evidence showed that the defendant said he owned the land and referred to it as "my land." The court said: "The word 'owner' is one of wide and extensive meaning when applied to real estate. It includes a rightful proprietor; one who owns the fee; one who has an estate less than a fee; any one who owns an estate in lands; the person entitled to the legal estate; any one who has an equitable right to or interest in land, or one who has any right which, in law or equity, amounts to ownership in the land." Under the facts in the case, the court said: "We think it must be conceded that defendant had an equitable interest in the land by virtue of the contract and deed to him in escrow from the owner of the legal title, * * *. In view of the testimony of Krauss, the complaining witness, that defendant did not at any time represent to him that he was the owner of the record title, * * *." The conviction obtained in the district court was reversed and dismissed.

In the case of Graf v. State, *supra*, the defendant had a valid and enforceable option on which he made two payments in the amount of $1,600. In the instant case the option had expired, and no payments were made on the contract. In the instant case the contract stated that the seller had a good and valid title in fee simple at the time the false representation was alleged to have been made. There was no claim made by the defendant Graf that he had the power to execute a conveyance. The definition of the word "own" or "owner," as set forth in Graf v. State, *supra*, certainly has no application under the facts and circumstances of the instant case. The facts in Graf v. State, *supra*, are distinctively different than those in the instant case. This is likewise true in the cases of Eselin v. State, 113 Neb. 839, 205 N. W. 570,

and State v. Eudaly (Mo.), 188 S. W. 110, relied upon by the defendant, which have been considered and found to be inapplicable to the instant case.

In the instant case the seller did not even have an enforceable right to purchase the property when the money was obtained from the Sudykas, and was in default of any such right and unable to exercise the right to purchase. There were liens totaling nearly $4,000 filed against the property in question, and a mortgage outstanding in the amount of $9,000. None of these facts were revealed to the Sudykas. The evidence substantiates the charge in the information that the defendant and Allied Finance System, which he owned, had no power to execute a conveyance on December 6, 1952.

We said in Potard v. State, 140 Neb. 116, 299 N. W. 362: "When the necessary elements of the crime are sustained by evidence, the question of the intent with which the transaction was carried on is usually one for the jury to determine after a consideration of all the facts and circumstances. The fact that additional representations may have been made relating to future transactions are material only as circumstances to be considered by the jury in determining the question of intent."

Where the essential elements of the crime of obtaining money by false pretenses are present, it is no defense that the defendant had an option to buy the property on which he made default. See, Brennan v. State, supra; Hameyer v. State, 148 Neb. 798, 29 N. W. 2d 458; State v. Pierson, 47 Del. 397, 91 A. 2d 541; State v. Stanley, 116 Kan. 449, 227 P. 263; 22 Am. Jur., False Pretenses, § 51, p. 471. We conclude that the evidence was sufficient to submit to the jury the charge filed against the defendant as alleged in the amended information.

The defendant predicates error in the giving of instruction No. 8 by the trial court, which reads as follows: "The words 'power to execute a conveyance' of the real estate involved herein, as used in these instructions, means the present opportunity and ability, under all

the surrounding facts and circumstances which you find to exist in this case, to procure the legal title and to transfer it to another, or the present opportunity and ability to direct and to cause the title to be transferred to another."

The defendant contends that this instruction unduly restricted the definition of "power to execute a conveyance" and thereby created a false issue under the facts in the instant case. The amended information charges that the defendant falsely pretended that he, or a company owned by him, "was the owner of or had the power to execute a conveyance of" certain real estate. There was no objection made by the defendant to the form or substance of the information, and any such objection has been waived. See Thompson v. O'Grady, 137 Neb. 641, 290 N. W. 716.

The instruction complained of relates to the present opportunity and ability to procure and transfer the legal title to the real estate involved on December 6, 1952. The jury was required to determine what representations were made by the defendant on that date and what he was able to do with respect thereto. This was a proper instruction when considered with all the other instructions in the case. The following is applicable.

In Kirkendall v. State, 152 Neb. 691, 42 N. W. 2d 374, the court said: "Where instructions, considered as a whole, state the law fully and correctly, error will not be predicated therein merely because a separate instruction, considered by itself, might be subject to criticism." See, also, Vanderheiden v. State, 156 Neb. 735, 57 N. W. 2d 761.

For the reasons given in this opinion, we conclude that the verdict of guilty and judgment entered thereon should be and are hereby affirmed.

AFFIRMED.