KEITH R. BEYL AND CALVIN C. EATON, PLAINTIFFS IN ERROR, v. STATE OF NEBRASKA, DEFENDANT IN ERROR.

85 N. W. 2d 653

Filed October 18, 1957. No. 34160.

*William S. Padley,* for plaintiffs in error.

*Clarence S. Beck,* Attorney General, and *Richard H. Williams,* for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Counts I and II of an information each separately charged that on or about June 4, 1956, Keith R. Beyl and Calvin C. Eaton, hereinafter called defendants or by name, unlawfully and feloniously obtained money from Burns, O'Connor and Skinner, a partnership hereinafter called the company, by specified false pretenses with intent thereby to cheat and defraud. Counts III and IV of the information each also separately charged that on or about the same date said defendants unlawfully and feloniously conspired with intent to commit a felony and thereby obtain money from said company by specified false pretenses and overt acts to effect the object of the conspiracy.

At conclusion of the State's evidence, defendants moved to dismiss counts I and II for the reasons that the State had failed to prove that the false pretenses alleged to have been committed by defendants were relied upon by the company, whereby it parted with the amount of $156.06 as alleged in each of said counts, and had failed to prove that the loads of grain alleged to have been sold to the company in each of said counts actually weighed 6,370 pounds less than the amount paid therefor by the company. At the same time, defendants moved to dismiss counts III and IV for the reasons that the State had failed to prove any of the elements of conspiracy as between defendants, or that there was any relationship between them in connection with the alleged misrepresentations, and that for want

of reliance thereon the crime of obtaining money by false pretenses had not been committed, consequently no conspiracy existed. No ruling was made upon such motions at that time, but they were overruled at conclusion of all the evidence, and the cause was submitted to the jury upon all four counts. Thereafter, it returned a verdict finding: "* * * said defendants guilty of obtaining money by false pretenses in Count One and Two of the Information as they stand charged. We further find said defendants guilty of conspiracy in the Third and Fourth Counts of the Information as they stand charged. We further find that at the time of the alleged offense the said defendants obtained property of the value of One Hundred fifty-six and 06/100 Dollars., in Count I and in Count II."

Subsequently, defendants' motion for new trial was overruled and judgment thereon was rendered, whereby each defendant was sentenced on each of counts I and II, and on each of counts III and IV. Therefrom defendants prosecuted error to this court, assigning in substance that there was error as follows: (1) In the admission and rejection of certain evidence; (2) in the refusal and the giving of certain instructions; and (3) that the verdict and judgment were not sustained by sufficient evidence and were contrary to law. We sustain assignment (3) with relation to counts I and II, but conclude that otherwise the assignments should not be sustained.

We summarize the material and relevant evidence adduced by the State, which discloses the following: On June 4, 1956, the company was engaged in farming and cattle feeding on a section of land located about 7 miles northeast of Lexington. At that time it was feeding about 4,000 head of cattle. Dennis O'Connor, Sr., was a partner and the resident company manager. His son, Dennis O'Connor, Jr., was a general employee of the company. The two other partners lived in Kansas City, Missouri. The company owned a grain elevator con-

taining a Fairbanks-Morse Registering Beam scale, a
residence, and certain other improvements located in
about the center of the section. Sketches of the elevator,
prepared by a civil engineer, photographs of Eaton's
truck used in the afternoon of June 4, 1956, and perti-
nent portions of the elevator, its weighing scale, and
office, together with related weighing tickets made on
June 4, 1956, and two extra disk weights belonging to
Beyl which were alleged to have been used by defendants
in order to unlawfully obtain credit for excess weights
of and payment for barley sold to the company, appeared
in the State's evidence.

On June 4, 1956, defendants each were and had been
for several years engaged in the buying, hauling, and
selling of grain with their own trucks. The company,
by oral agreement with defendants, was buying barley
for feeding purposes from them at $2.45 a hundred-
weight, provided it tested 50 pounds per bushel. Such
grain was weighed at, stored in, and paid for at the
company's elevator. Prior to June 4, 1956, defendants
had already delivered and sold about 19 loads to the
company. In doing so, defendants had been coming
out to the elevator to sell grain for 2 or 3 years. During
the last year, prior to June 4, 1956, they had come there
together, either by bringing their grain in two separate
trucks or by both of them bringing it with one truck.

On June 4, 1956, Dennis, Jr., was operating the ele-
vator, weighing trucks, and unloading grain in the ele-
vator. On that date, about 11:30 a. m., defendants,
each driving his own truck loaded with barley, ap-
proached the elevator. Eaton's truck, driven by him,
was ahead. Beyl's truck, driven by him, followed Eaton's.
Thereupon Eaton drove his truck into the elevator and
stopped. It will be noted that he stopped his truck
with the two front wheels thereof up on the scale plat-
form. The grain in Eaton's truck belonged exclusively
to him. After stopping, he loosened the tarp over the
grain and handed Dennis, Jr., a sample of barley for

testing its weight per bushel. Beyl then remained with Dennis, Jr., watching him make the test, which took about 5 minutes, but Eaton got off his truck, then walked around in front of it toward the scale room and out of sight. After the test was made and found to meet specifications, it was Beyl who drove Eaton's truck up on the scale for weighing the gross, and Dennis, Jr., went around into the scale office to do so. At that time he saw that two extra disk weights of a different type and color than the seven weights usually and properly hanging on the beam rod had been placed under the top weight thereof on the contour balance rod at the south end of the scale beam. Such extra weights were there when he took and stamped the gross weight on the tickets, which were made in triplicate, but he didn't then say or do anything about it. He then walked out of the scale office, and Eaton's truck was backed up over the pit for unloading, whereupon Eaton said: " 'We got a pretty good jag on.' " After Dennis, Jr., had started the elevator motors, he and Eaton unloaded and cleaned out the trailer. Dennis, Jr., then got down off the truck, pulled it back up on the scale, cleaned up around the pit, and went back to weigh the empty truck. However, in weighing the tare, he noticed that the two extra disk weights had been removed from the contour balance rod and that the seven weights usually and properly there were in their normal position again. He then stamped the tare on the weight tickets, wrote the net weight thereon, and gave Eaton the first copy. The tickets showed a gross weight of 56,360 pounds, less a tare weight of 17,760 pounds, leaving a net weight of 38,600 pounds of barley.

There is ample competent evidence that as a result of the two extra disk weights being so placed on the contour balance rod before the gross was determined but removed thereafter before the tare was taken, Eaton received a ticket credit for a net of 6,370 more pounds of barley at $2.45 a hundred than his truck actually

contained. For such excess he was subsequently paid $156.06 by the company.

In that connection, the evidence clearly supports the conclusion that Eaton was the only person who would gain by so placing and removing the two extra disk weights. He was also the only defendant who could have placed them on the contour balance rod of the scale. It is not so clear who removed them, but it appears that Beyl was absent during the unloading, and the whereabouts of defendants was not clearly shown while Dennis, Jr., was cleaning up around the pit and drove Eaton's truck up on the scale platform to take the tare. After the tare was taken, Eaton's truck was pulled out of the way and a straight truck of hay belonging to the company was weighed. Up to that time, however, no one had been present at the elevator except Dennis, Jr., and defendants. When the hay truck backed out, Beyl drove his truck up and they went through a comparable procedure in testing his barley, weighing the gross, unloading it, and weighing the tare. However, during that procedure there were no weights on the contour balance rod except the usual and proper ones during the weighing of the gross load, and nothing improper was seen with regard to the second load, which belonged exclusively to Beyl.

When defendants left the elevator they said they would be back after dinner with another load. Thereafter, Dennis, Jr., told his father what had happened during the morning, and, with the father consenting, Dennis, Jr., called the sheriff, whereupon the deputy sheriff and county attorney drove out to the elevator, where they arrived at about 1:30 p. m. There they met Dennis, Jr., and awaited the arrival of defendants. At about 3 p. m. both defendants came back together in the truck belonging to Eaton, which was loaded with barley belonging exclusively to him, although it appears that some of it may have belonged to Beyl as a result of previous transactions between them. In the mean-

time, Dennis, Jr., had bored two peep holes about the size of a nickel in the south wall of a north storage bin wall, through which the scale office, the scale, and what subsequently happened therein and adjacent thereto, could be and was clearly observed by the deputy sheriff. Shortly before defendants' arrival, Dennis, Jr., in the presence of the deputy sheriff and county attorney, examined and saw that the scale was balanced.

The deputy sheriff was in the scale office when he realized that defendants, both of whom he knew, were approaching the elevator with Eaton's truck. Thereupon the deputy sheriff walked out of the scale office into the storage bin where the peep holes had been bored. While there, looking through one of the peep holes, he saw Eaton's truck driven by Eaton coming from the south almost to the elevator, and saw him pull up and stop with part of his truck in the elevator. It will be noted again that he drove his truck up with the two front wheels thereof on the scale platform. The deputy sheriff then saw Beyl get out and come around in front of the truck, then walk into the scale office. He didn't see where Dennis, Jr., was at that time, but knew that he was out there some place. In that connection, Dennis, Jr., testified that Eaton drove his truck into the elevator and partly up on the scale platform as he did in the morning, then loosened the tarp over the grain and gave Dennis, Jr., a sample of barley for testing the weight per bushel, and that during the testing, which met the specifications and took about 5 minutes, Eaton stayed with him but Beyl walked around in front of Eaton's truck toward the scale office and out of his sight. After the testing, Dennis, Jr., walked around to the scale office and Eaton drove his truck up on the scale. Dennis, Jr., then weighed the gross while Beyl was standing behind him. When such gross was taken, Dennis, Jr., saw that the same two extra disk weights had been placed on the contour balance rod, but unlike their position with the first load they had then been

placed under the two top weights of the seven usually and properly thereon. After taking the gross, Beyl said: " 'We got almost as much on here as we had this morning.' " Dennis, Jr., then went around and turned on the elevator motors while Eaton backed his truck over the pit and Dennis, Jr., and Eaton unloaded the truck. After unloading, Dennis, Jr., swept up the pit and Eaton drove his truck up on the scale again, where, in the presence of the deputy sheriff, the county attorney, and Beyl, Dennis, Jr., weighed the tare. In doing so, he again saw that the two extra disk weights had been removed from the contour balance rod. He then stamped and prepared the weight tickets in triplicate, which showed a gross of 45,770 pounds and a tare of 14,310 pounds, with a net of 31,460 pounds, as a result of which Eaton again received a ticket credit for a net of 6,370 more pounds of barley at $2.45 a hundred than his truck actually contained. For that excess he was also subsequently paid $156.06 by the company.

With reference to that load, the deputy sheriff testified that, looking through the peep hole prior to taking the gross, he actually saw Beyl enter the scale office, take the two extra disk weights out of his right coverall pocket with his right hand, and with his left hand place them on the contour balance rod under the top weights of the seven usually and properly thereon. Further, before the tare was taken the deputy sheriff actually saw Beyl slip back into the scale office and remove the two extra disk weights from the contour balance rod and place them back into his right coverall pocket. Thereupon, the deputy sheriff walked out of the storage room toward the scale office and, meeting Beyl there by the door, took such extra weights out of Beyl's right coverall pocket, whereupon Beyl admitted that "They were his"; that he had them "Quite a while * * * for about ten years." He denied that he had used them that day but said "he had them in case he needed them." The deputy sheriff then marked such weights by putting an "X"

and his initials "J. R." in about the center of the bottom of each with a red pencil, and kept them in his possession for safe keeping. Upon proper foundation, they were offered and received in evidence. There was also competent evidence that they were the same weights as were used in weighing the gross of the first as well as the third load. In that connection, as stamped thereon, they each weighed 2 pounds and were slotted from the rim to just beyond the center, which made it possible to slide them on the scale's contour balance rod under the weights usually and properly there, which were not slotted but hung on the rod through a hole in the center of each of them. During the events and procedure aforesaid, no one was in or about the elevator except defendants, Dennis, Jr., the deputy sheriff, and the county attorney.

After defendants had received their weight tickets, they walked up to the house of Dennis, Sr., and returned with him to the scale office. There, in the presence of defendants, Dennis, Jr., the deputy sheriff, and the county attorney, Dennis, Sr., figured the amount due each defendant upon the basis of the excess net weights caused by the conduct aforesaid. Thereupon, although Dennis, Jr., an employee of the company, and Dennis, Sr., the manager in charge of the company, both knew that the net weights were wrong and that defendants were falsely claiming too much money by reason of their conduct heretofore recited, Dennis, Sr., prepared, signed, and delivered a company check to Beyl for the second load, and a company check to Eaton for the first and third loads for the full amounts claimed by them, and such checks were subsequently cashed by defendants.

Therefore, without contradiction, the State's evidence affirmatively disclosed that the company, with knowledge of the truth, did not rely upon the false pretenses perpetrated by defendants, and were not induced thereby to make such payments of money to defendants. What induced such payments is not explained, but there was

ample competent evidence that defendants made the false pretenses and misrepresentations as charged with the intent to and that they did actually cheat and defraud the company thereby.

That situation with regard to counts I and II is controlled by Goldman v. State, 128 Neb. 684, 260 N. W. 373, which dealt with a prosecution under what is now section 28-1207, R. R. S. 1943. In that opinion, quoting from 25 C. J. 599, and citing Mason v. State, 99 Neb. 221, 155 N. W. 895, and McDonald v. State, 124 Neb. 332, 246 N. W. 716, this court said: " 'It is not sufficient that there is a false pretense; the owner of the property must rely on it; the pretense must be an effective cause in inducing the owner to part with his property. Therefore, if the owner has knowledge of the truth or does not believe the pretense, or, although believing it, yet parts with the property on some other inducement, or investigates it and parts with the property, relying entirely on the results of his investigation, the offense has not been committed. But although the owner makes some investigation of the representations made by the accused to ascertain their truth, yet if he nevertheless would not have parted with the goods but for such representations, believing them true, accused is guilty.' "

Therefore, under the facts and circumstances presented in this case, defendants could not lawfully be convicted of obtaining money by false pretenses as separately charged by counts I and II. Thus, the trial court erred in overruling defendants' motion to dismiss said counts. However, contrary to defendants' contention, instructions Nos. 5, 6, and 11 did separately and specifically instruct the jury with regard to the necessary element of reli-, ance aforesaid by language substantially as requested by defendants in their requested instruction No. 1. In view of our conclusion with regard to counts I and II, such instructions, and instructions Nos. 16 and 18 as well, which related thereto, could not have been prejudicial to defendants as claimed by them, because such distinct

and separate instructions dealt entirely with counts I and II, a distinct and separate crime from that charged in counts III and IV upon which the trial court properly instructed the jury.

Defendants assigned: (1) That the trial court erred in the admission of certain testimony of three named witnesses with regard to testing the scale involved and finding that it was accurate, upon the ground that such evidence was too remote; and (2) that the trial court erred in excluding certain evidence offered by defendants with respect to claimed errors in weighing loads on the same scale prior to and after the alleged crimes. Defendants' first contention related to an inspection of the scale for accuracy made on June 13, 1956, by a trained representative of the company which manufactured the scale, and inspections for that purpose regularly made by two state scale inspectors on April 9, 1956, and again on August 29, 1956. No authority is cited to support defendants' contention with relation thereto, but the controlling general rule is that the admissibility of such evidence is a matter resting largely in the discretion of the trial court and a ruling thereon will not be disturbed unless an abuse of discretion clearly appears. 20 Am. Jur., Evidence, § 249, p. 243; Metropolitan Life Ins. Co. v. Armstrong, 85 F. 2d 187. With regard to defendants' second contention, the record discloses that defendants were permitted to and did fully and in detail adduce evidence regarding their claimed errors in weight on the scale prior to and after June 4, 1956. The evidence excluded was simply a repetition of that already admitted. Neither of defendants' contentions has any merit.

The primary questions remaining then are: (1) Whether or not the evidence adduced by the State was sufficient to support a verdict finding defendants guilty of conspiracy as charged in counts III and IV; (2) whether or not the trial court erred in giving instructions Nos. 8 and 9 which allegedly failed to properly sub-

mit the necessary elements of conspiracy; and (3) whether or not this court may vacate the verdict and reverse the judgment on counts I and II, yet affirm the judgment on counts III and IV.

In connection with the alleged insufficiency of the evidence to support defendants' conviction of conspiracy, they argued that there was no evidence that Eaton committed any unlawful act at any time and no evidence of any collusion, conspiracy, overt act, or intent on his part to commit a crime. We conclude otherwise.

Section 28-301, R. R. S. 1943, provides: "If two or more persons conspire to commit any felony or to defraud the State of Nebraska in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties in such conspiracy shall be fined not more than ten thousand dollars or imprisoned in the penitentiary not more than two years or both." See, also, section 29-2014, R. R. S. 1943, which provides: "In trials for conspiracy, in cases where an overt act is required by law to consummate the offense, no conviction shall be had unless one or more overt acts be expressly alleged in the indictment, nor unless one or more of the acts so alleged be proved on trial; but other overt acts not alleged in the indictment may be given in evidence on the part of the prosecution."

In Platt v. State, 143 Neb. 131, 8 N. W. 2d 849, this court held: "In a prosecution under section 28-301, Comp. St. 1929 (now section 28-301, R. R. S. 1943), the state is required to prove an unlawful conspiracy to commit a felony or to defraud the state, and the doing by one or more of the conspirators of an overt act to effect the object of the conspiracy.

"Where the overt acts tend to establish a scheme or plan to defraud the state, they may be properly shown as evidence of a preexisting unlawful conspiracy."

By analogy, of course, the latter rule applies alike where the overt acts tend to establish a scheme or plan

to commit a felony. In that opinion, this court said: "Defendant urges that there is no evidence in the record sufficient to sustain a finding that a conspiracy existed within the meaning of the statute. The essence of a criminal conspiracy is an unlawful agreement to violate a criminal statute. It is not necessary that direct evidence of a positive agreement to jointly participate in the violation of a criminal statute be produced in order to establish the crime. A criminal conspiracy must necessarily be entered into with the intent to defraud the state or to violate a criminal law and, intent being a matter of the mind, it is rarely possible to prove that element of the crime except by circumstances. * * * The statute contains the provision 'and one or more of such parties do any act to effect the object of the conspiracy.' This requires the allegation of an overt act in the information and proof thereof by evidence beyond a reasonable doubt. We think that an overt act done in furtherance of the conspiracy was alleged and amply proved. The overt acts established by the evidence are proper to be considered by the jury in connection with all the other evidence in determining whether a conspiracy existed, and where, as in this case, the overt acts tend to establish a scheme or plan to accomplish some unlawful object, they may be properly shown as evidence of a preexisting conspiracy. * * * It is urged that a wrongful intent is an essential element of the crime and that the state has failed in its proof on this point. * * * Intent being a frame of mind difficult of discovery by direct evidence, it is usually necessary to determine it by the circumstances and conduct of the person involved rather than by his expressed statements. * * * The defendant urges that one person cannot conspire with himself, and where two persons are tried and one is acquitted, the other must also be acquitted. * * * There can be no question that there must be a degree of dependent criminality between coconspirators to violate a criminal statute in order for a conviction to stand.

In other words, the guilt of both must concur in order to establish the guilt of either." Such statements have application and are controlling here.

That opinion then went on to conclude that when two defendants and no more are charged with conspiracy and tried together under the same evidence, as distinguished from separate trials wherein the evidence might well be different, the failure of proof as to one defendant would amount to a failure of proof as to both, and require acquittal of both. However, contrary to defendants' contention, such latter rule has no application here because there was sufficient proof from which the jury could have concluded beyond a reasonable doubt, as it did, that both defendants were guilty of conspiracy as charged. Also, contrary to defendants' contention, we find that instructions Nos. 8 and 9, given by the trial court, although prolix, did separately, specifically, and clearly submit every element of the crime of conspiracy which the State was required to establish beyond a reasonable doubt. The alleged false pretenses made by defendants, which the State established by competent evidence, were simply overt acts committed by defendants in order to effect the object of their conspiracy. It was not necessary that defendants should be found guilty of the distinct and separate crime of obtaining money by false pretenses in order to convict them of conspiracy to commit such a crime. In other words, the offense of obtaining money or property by false pretenses under section 28-1207, R. R. S. 1943, as separately charged in counts I and II, and the offense of conspiracy to commit a felony under section 28-301, R. R. S. 1943, as separately charged in counts III and IV, are distinct and separate crimes. An acquittal of the first for failure of the State to support the element of reliance by competent evidence does not require acquittal or reversal of conviction of the second if the elements thereof are supported by competent evidence and there is no prejudicial error in submission thereof.

The question then is, having concluded that the evidence was not sufficient to support a conviction of obtaining money by false pretenses as charged in counts I and II, but that the State's evidence was sufficient to support defendants' conviction of conspiracy as charged in counts III and IV, may this court vacate the verdict and reverse the judgment on counts I and II, but affirm the judgment on counts III and IV?

In that regard, Yeoman v. State, 81 Neb. 244, 115 N. W. 784, as modified on rehearing at 81 Neb. 252, 117 N. W. 997, is controlling. Therein, this court said: "This brings us to the question of our power to reverse the judgment of the district court in part and affirm it in part. It is with some hesitation that we have reached the conclusion that this may be done. In 12 Cyc. 937, it is said: 'The appellate court may reverse a judgment of a lower court as to part and affirm as to part, where the legal part is severable from that which is illegal.' This rule, we find, is supported by the decisions of the courts of last resort in many of the states, and it also appeals to sound reason. Now, in the case at bar, each count of the information charges the defendant with a distinct and separate crime; the verdict specifically responds to each of said counts, and a several, separate and distinct judgment appears to have been pronounced upon each of the separate findings of the jury as expressed in their verdict." A like situation is presented in the case at bar.

The record herein discloses sufficient evidence adduced by the State to support a conclusion that both defendants conspired with the intent to commit a felony and thereby obtain money by false pretenses. All of the evidence adduced by the State was clearly and properly admissible to support counts III and IV charging defendants with conspiracy. The overt acts of defendants which were established by the State's evidence were entirely sufficient and proper to be considered by the jury in connection with all other evidence and

circumstances in determining whether or not a conspiracy existed as charged, and where as here such overt acts tended to establish a scheme or plan to intentionally effect the object of the conspiracy and thereby accomplish some unlawful object, they may be and were properly shown as evidence of a preexisting conspiracy to commit a felony.

True, the evidence adduced by defendants conflicted in some material respects with that adduced by the State, but its substance becomes of no importance here in the light of applicable and controlling rules reaffirmed by this court in Birdsley v. State, 161 Neb. 581, 74 N. W. 2d 377.

For reasons heretofore stated, the judgment of the trial court based on counts III and IV should be and hereby is affirmed, but the verdict finding defendants guilty on counts I and II should be and hereby is vacated, the judgment of the trial court based thereon is reversed, and counts I and II are dismissed.

AFFIRMED IN PART, AND IN PART REVERSED AND DISMISSED.