STATE OF NEBRASKA, APPELLEE, v. OPHELIA BOHANNON, ALSO KNOWN AS OPHELIA JONES, APPELLANT.

193 N. W. 2d 153

Filed December 23, 1971. No. 38066.

Shrout, Lindquist, Caporale, Brodkey & Nestle, for appellant.

Clarence A. H. Meyer, Attorney General, and Harold Mosher, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

BOSLAUGH, J.

The defendant appeals from a conviction for obtaining money under false pretenses. The assignments of error relate to the sufficiency of the evidence to sustain the conviction.

The information charged that from July 1965 to December 1969, the defendant obtained money in excess of $35 from Douglas County, Nebraska, by false pretenses. The jury fixed the value of the money obtained at $3,000.

The evidence shows that defendant is the mother of 9 children and is divorced from William Bohannon, Sr. She applied for Aid to Dependent Children (ADC) in the early 1960's, and received a grant of $195 per month. In July 1967, the grant was increased to $344 per month. From July 1965 through December 1969, she received $13,654.50 in ADC funds.

Eligibility for a grant under the ADC program is determined in part by the resources of the recipient. A parent and 9 children are allowed a maximum of $1,700 in liquid assets under the plan in force in Nebraska. At 6-month intervals a recipient is required to furnish a written statement of assets to the welfare department. This statement is used by the department to determine

whether the recipient is eligible to continue to receive a grant under the program.

In 1965, the defendant moved into a house at 4416 North Thirty-eighth Street in Omaha, Nebraska. On July 7, 1965, the defendant, using the name of Ophelia M. Jones, had entered into a contract to purchase this property on an installment basis. The contract was recorded in November 1965. She represented to the welfare department that this property was owned by Clifford E. Jones and that she was renting it for $75 per month.

On April 29, 1966, the defendant opened a checking account in the Ames Plaza Bank, using the name of Ophelia M. Bohannon. On May 9, 1966, the account was changed to a joint account in the names of Clifford or Ophelia M. Jones.

On September 29, 1967, a certificate of title to a 1967 Cadillac automobile was issued to the defendant, using the name of Ophelia M. Jones.

In February 1968, the defendant, using the name of Ophelia Jones, entered into a contract with Clifford E. Jones for the purchase of a property at 2407 Ames Avenue where Jones operated a music shop known as Psychedelic Sounds. The contract was recorded in February 1968.

On July 23, 1969, a certificate of title to a 1966 Chevrolet automobile was issued to the defendant, using the name of Ophelia M. Jones.

The record contains 6 asset statements signed by the defendant dated October 18, 1965, August 26, 1966, March 15, 1967, September 20, 1967, January 30, 1969, and September 15, 1969. The checking account, the real estate, and the automobiles are not listed on any of these statements.

The defendant claims that she has no beneficial interest in any of the items which were omitted from the asset statements. She contends that the checking account, the real estate, and the automobiles are really the property of Clifford E. Jones and that Jones placed the

property in her name in an effort to avoid any claim by his divorced wife. Jones testified that he was the owner of the property in question.

The records of the welfare department show that on November 15, 1967, a neighbor complained that the defendant was "buying property, driving a 1968 Cadillac and living with a man." A caseworker called on the defendant to discuss the complaint. The defendant told the caseworker that Jones, her landlord, was "divorced and desires arrangements to keep his property from his ex-wife and children. Therefore, he wanted to place his new car and some property he had bought in her name." The caseworker advised the defendant "to have the name changed on this car registration and property." About 6 weeks later the department ascertained that a Cadillac automobile was registered under the name of Ophelia M. Jones. On February 8, 1968, the caseworker again visited the defendant and "emphasized the importance of Mr. Jones putting the car into his name."

Apparently, the department did nothing further until 1970 when the records in the courthouse were examined and it was ascertained that the Cadillac was still registered in the defendant's name and that she was a party to the contract to purchase the property on Ames Avenue. Her grant was then suspended as of January 1, 1970, and her case closed on April 1, 1970, "because of assets in excess of eligibility."

The gist of the offense is obtaining the money of another by false pretenses, with the intent to cheat and defraud. Dwoskin v. State, 161 Neb. 793, 74 N. W. 2d 847. The evidence of the State tended to prove that the defendant was the owner of the property omitted from the asset statements. The jury was not required to believe the testimony of the defendant and Jones that she had no beneficial interest in the property. It is not the province of this court to determine the credibility of witnesses or weigh the evidence in a criminal case.

An essential element of the offense is that there be re-

liance upon the representations made. Beyl v. State, 165 Neb. 260, 85 N. W. 2d 653. The pretense must be an effective cause in inducing the owner to part with his property, and if the owner has knowledge of the truth, the offense has not been committed. However, the pretense need not be the sole moving cause that induced the owner to part with his property. Wax v. State, 43 Neb. 18, 61 N. W. 117.

To the extent that the welfare department had knowledge of the defendant's ownership of property omitted from the asset statements there was no reliance on the asset statements. The record does not show that the welfare department had any information concerning the checking account, the property on Ames Avenue, or the 1966 Chevrolet automobile until after December 1969. As to these items the jury could find that the welfare department relied upon the asset statements.

The defendant contends that the evidence is insufficient to establish an intent to cheat and defraud the county. The intent to cheat and defraud may be proved by the circumstances surrounding the transaction. State v. Swanson, 179 Neb. 693, 140 N. W. 2d 618.

The defendant argues that she did not want to have the grant continued; that it was reinstated in 1969 without any request from her after a 3-month suspension; and that she did not appeal from the action of the department in closing her case in 1970. The record shows that the defendant could have terminated the grant at any time by a written request to the department. If the defendant did not want the money, she could have returned the checks instead of cashing them. The fact that she did not comply with the advice of the caseworker in regard to the Cadillac automobile and the property on Thirty-eighth Street was a circumstance to be considered by the jury in determining her intent.

The judgment of the district court is affirmed.

AFFIRMED.

CLINTON, J., dissenting.

I respectfully dissent.

This court has held in a large number of cases, one of which is Beyl v. State, 165 Neb. 260, 85 N. W. 2d 653, that an essential element of the crime of obtaining money by false pretenses is reliance by the defrauded party upon the alleged false representation. In the cited case this court approved a statement from other Nebraska cases as follows: " 'It is not sufficient that there is a false pretense; *the owner of the property must rely on it;* the pretense must be *an effective cause in inducing* the owner to part with his property. Therefore, if the owner has knowledge of the truth or does not believe the pretense, or, although believing it, yet parts with the property on some other inducement, or investigates it and parts with the property, relying entirely on the results of his investigation, the offense has not been committed.' " (Emphasis supplied.)

The record in this case clearly discloses, I think, as a matter of law that (1) the information contained in the official records of the welfare department shows that at the time the payments were made the welfare department did not (and as a matter of law could not) rely upon the alleged misrepresentations contained in the asset statements because the department had knowledge of the facts which the State now claims were fraudulently concealed, and (2) the evidence in this case does not show Mrs. Bohannon had assets (including those originating with Jones) which made her children ineligible for ADC payments. Any failure to disclose facts which, if known, would not have made her ineligible to receive the payments on behalf of her children is legally immaterial because the existence of such facts could not be the basis of denial of aid. As a consequence such nondisclosure, whether deliberate or through misunderstanding, could not be an *effective cause* in inducing the payments because if known they would not have been lawful grounds for denying payment.

As to the facts of reliance the State itself introduced into evidence reports of the caseworkers whose duty it was to supervise the Bohannon case. As the majority opinion points out, on December 6, 1967, the caseworker investigated a complaint that Mrs. Bohannon was driving a Cadillac and buying property. The caseworker's report under date of December 6, 1967, shows: "Mrs. B. explained that the man with whom she has been going is divorced and desires arrangements to keep his property from his ex-wife and children. Therefore, *he wanted to place his new car and some property he had bought in her name.* Also, Mrs. B. stated that this man is the landlord of her house and does occasionally visit but never lives with her. Caseworker advised her that this was not an acceptable situation. Mrs. B. stated that this man had asked her to marry him; however, she is not certain what her decision will be. *Caseworker advised her to have the name changed* on this car registration and property." (Emphasis supplied.)

A report of another caseworker under date of January 30, 1969, is as follows: "Mrs. B's. home is in good condition and quite large. The furniture and interior decoration job in the living room is in excellent taste. The room is panelled in dark wood and furnishings and walls are done in reds and burnt oranges. This home hardly compares with any other ADC families. This lavishness is due to the fact that Mrs. B. has a rich boy friend. He leaves one of his cars, a grey and black 1968 Eldorado Cadillac with Mrs. B. to let her drive. He has a business of his own on 24th Street. *Mr. Jones wants to have everything in Mrs. B's. name. The reasons for this are not established.* Mrs. B. *rents the house from* Mr. Jones at only $75, and *he pays the utilities and buys her extras when needed."* (Emphasis supplied.) A similar report under date of April 1, 1969, shows: "At Mrs. Bohannon's request a home visit was made this date. Mrs. Bohannon finally admitted that Mr. Jones and her were not really married in St. Paul as she had reported.

Mrs. B. reported that Mr. Jones only wants every one, his mother, their friends, plus the Welfare Department to think that he is married to Mrs. B. It seems that Mrs. B. handles his business affairs. *By having everything he owns in Mrs. B's. name* he feels that his ex-wife cannot claim anything for herself." (Emphasis supplied.) The majority opinion itself shows Mrs. Bohannon made no attempt at concealment. The contracts of purchase were recorded immediately in each instance. The welfare department knew at least as early as January 28, 1968, that she was using the name of Ophelia Jones.

The above clearly discloses the welfare department knew that property alleged to have originated with Jones was in fact in Mrs. Bohannon's name and that it was in fact being used to "pay utilities and buy her extras when needed."

The welfare department continued making ADC payments despite the knowledge it had. The record establishes as a matter of law that the welfare department did not rely upon the asset statements of August 26, 1966, March 15, 1967, September 20, 1967, January 30, 1969, and September 15, 1969, because it had actual knowledge they were not correct.

This set of facts cannot be distinguished from the Beyl case which we have cited. In that case the defendant was charged with obtaining money by false pretenses from a grain buyer. The scale operator at the elevator discovered the falsity of the representations prior to delivery of the check for the grain which was involved in connection with the falsity, but he delivered the check anyway. The court held the crime was not committed.

Introduced into evidence were certain regulations of the State Department of Welfare. These regulations include the following: *"MAXIMUM AVAILABLE RESOURCES:* An ADC unit need not be entirely without resources to be eligible for assistance. A moderate amount of cash, insurance, or other resources on which

the child or family may draw in case of emergency or other acute need may contribute measurably to family security and stability. The standards below are applicable to determining eligibility on the basis of available resources:

Unit without parents, one child _____$ 750
Unit without parents, two children _____$1500
Unit with one parent and one child _____$1500
For each additional child or parent add _____$  25

. . .

*"DETERMINATION OF OWNERSHIP OF RESOURCES:* Property which appears on record in the name of an ADC unit must be considered his. Ownership of real estate may be determined through documentary sources. Records in the office of the register of deeds or office of the county clerk will show in whose name the property is recorded. Information in regard to estates which have not been settled or which are in probate may be secured through the records of the county court. *In case of joint ownership, the terms on which the property is held will need to be verified.* If the property has come to the holder as a part of an estate, the records of the county court are consulted; if by joint purchase, the facts will appear in the record of the deed. *Jointly owned personal property in some instances may be liquidated by any one of the holders."* (Emphasis supplied.) The regulations also exempt from the definition of available resources certain items and these include the following: "(a) real property which the unit occupies as a home; (b) household goods of moderate value used in the home; . . . (d) resources to a maximum value of $3,000 used by the unit in a planned effort directed toward self-support; . . .." The regulation which defines available resources also provides: "The worth of resources, both available and exempt, is determined on the basis of their *current market value."* (Emphasis supplied.)

This brings us to the second reason why the record

will not support a conviction. There is no evidence in the record that on any of the asset statements dates upon which statements the State relies for the false pretense the defendant had "assets available" in excess of those allowed by the regulations. The home itself is an exempt asset and need not be considered. As to the Cadillac and business property which was being purchased under contract, the record discloses only equities existed, and there is no evidence in the record to show the market value of these equities and what they could be converted into for cash. As to the bank account which was involved, the balances therein on the date of the asset statements are as follows: August 26, 1966, $156.57; March 15, 1967, $308.48; September 20, 1967, $658.66; January 30, 1969, $285.33; and September 15, 1969, $151.21.

As noted from the Beyl and other cases, one of the elements of the crime is that the alleged representations must be "an effective cause" of the defrauded party parting with the money or property. Any immaterial representation therefore, that is, one which would not affect eligibility, could not be an effective cause within the foregoing definition. We must keep in mind here that we are not dealing with the case of a private individual being allegedly defrauded. We are here dealing with a case in which the party was legally entitled to the funds if she was eligible. I take it no one would deny that under the equal protection clauses of the Constitutions of the United States and State of Nebraska if a person is eligible for ADC he cannot be deprived thereof. This is certainly at least implicit in the opinions of the Supreme Court of the United States. Lewis v. Martin, 397 U. S. 552, 90 S. Ct. 1282, 25 L. Ed. 2d 561; King v. Smith, 392 U. S. 309, 88 S. Ct. 2128, 20 L. Ed. 2d 1118.

The record is wholly devoid of any evidence to show that Mrs. Bohannon had "available resources" in excess of the $1,700 which she was allowed by the regulations. Assuming that Mrs. Bohannon was legally free to liquidate the jointly owned property (which she was not),

there was no attempt by the State to prove the market value of the equities and that they exceeded the $1,700 available resources allowed. There is nothing whatever to show the music shop property is not an exempt property within the regulations of the welfare department.

We point out that on two occasions Mrs. Bohannon was suspended from welfare. On the last such occasion it was because of her representation she was married to Jones. When the welfare department found out this was not true, it put her back on without any request of her own. Apparently on the earlier occasion she was put back on without any request of her own. All these things fortify a conclusion there was no reliance. Section 43-512, R. R. S. 1943, places upon the county board of public welfare the obligation through its agents and employees to make an investigation of the allegations of any application. The welfare department is not entitled to rely upon the asset statements alone and disregard all the other information in its files furnished to it by the applicant.

An essential element of a jury verdict in these cases is a finding as to the amount of which the party was defrauded. In this particular case the jury found $3,000 although, as the majority opinion recites, she received after July 1965, $13,654.50. There is absolutely no rational way to tell from the evidence how the jury could arrive at such a figure. This again, to my mind, demonstrates that the jury verdict was the result of confusion and misunderstanding.

I would reverse the conviction for the reason the evidence is legally insufficient: (1) Because it shows as a matter of law that there was not and could not be any reliance upon the alleged false representations, and (2) because the record in this case fails to establish that the representations were material and could justify the withholding of the payments. It therefore fails to establish that any misrepresentations could be a legally effective cause of the payments.