STATE OF NEBRASKA, APPELLEE, v. CLINTON W. JOHN, APPELLANT.

328 N.W.2d 181

Filed December 10, 1982. No. 82-066.

Joseph Ginsburg of Ginsburg, Rosenberg, Ginsburg, Cathcart, Curry & Gordon, and Baldwin & McKernan, for appellant.

Paul L. Douglas, Attorney General, and Mel Kammerlohr, for appellee.

BOSLAUGH, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

CLINTON, J.
The defendant was charged with the crime of criminal conspiracy as defined by Neb. Rev. Stat. § 28-202 (Reissue 1979), found guilty by a jury, and sentenced to a term of 1 to 5 years' imprisonment. On appeal to this court he assigns and argues the following errors, which allegedly occurred during the course of the trial, and that these mandate either a dismissal of the charges or a reversal and new trial: (1) The evidence was, as a matter of law, insufficient to establish the crime charged, hence the defendant's various motions for a directed verdict of acquittal should have been granted. (2) The trial court erred in failing to define the elements of criminal conspiracy. (3) The trial court erred in submitting to the jury for its consideration alleged overt acts which, as a matter of law, could not constitute

overt acts within the meaning of the statute, and in failing to specifically define overt act. (4) The court erred in giving instruction No. 5, which stated in part, "The conspiracy may exist even though the party with whom it is charged the defendant conspired, pretended or feigned agreement and did not in fact intend to follow through." (5) The trial was conducted in a manner which, in several respects, prevented the defendant from having a fair trial, namely, (a) wholly hearsay and gratuitous remarks of witnesses were admitted; (b) the trial court received in evidence tape recordings of conversations of the defendant with an undercover agent posing as a hit man, as well as transcriptions of those conversations, which resulted in undue emphasis of that evidence; and (c) the transcript and tape recordings contained erroneous and prejudicial introductory information.

A consideration of the assignments of error makes it necessary that we first set forth the pertinent portions of the statute under which the defendant was charged, the charges as set forth in the information, and a summary of the evidence.

Section 28-202 provides in part: "(1) A person shall be guilty of criminal conspiracy if, with intent to promote or facilitate the commission of a felony:

"(a) He agrees with one or more persons that they or one or more of them shall engage in or solicit the conduct or shall cause or solicit the result specified by the definition of the offense; and

"(b) He or another person with whom he conspired commits an overt act in pursuance of the conspiracy."

The information charged: "Clinton W. John . . . did, on or about the 4[th] day of June A.D. 1981, in the County of Hall and the State of Nebraska aforesaid, with the intent to promote or facilitate the commission of first degree murder, did then and there, agree with one or more persons that they or one or more of them would engage in, solicit, or cause the

first degree murder of Barbara John, and that Clinton W. John did commit overt acts in pursuance of the conspiracy, to-wit:

"1. Clinton W. John, on June 4, 1981, provided a business card which listed his name and phone number to an individual whom he had asked to contact a person who would contract to kill Barbara John;

"2. Clinton W. John, during a telephone conversation on June 5, 1981, with an individual purporting to be a killer for hire, discussed arrangements for an in-person meeting and agreed to another telephone conversation the next day to arrange an in-person meeting with said individual;

"3. Clinton W. John made arrangements on June 6, 1981, during a telephone conversation with an individual purporting to be a killer for hire, to meet said individual on June 6, 1981, at 2:15 p.m. in the parking lot of the Interstate Holiday Inn in Hall County, Nebraska;

"4. Clinton W. John drove a pickup truck on June 6, 1981, to the Interstate Holiday Inn in Hall County, Nebraska, for the purpose of meeting an individual who purported to be a killer for hire;

"5. Clinton W. John met an individual purporting to be a killer for hire on June 6, 1981, at about 2:15 p.m. in the parking lot of the Interstate Holiday Inn in Hall County, Nebraska, and discussed with said individual methods, plans and arrangements for the first degree murder of Barbara John;

"6. Clinton W. John on June 6, 1981, gave an individual purporting to be a killer for hire a slip of paper which listed the probable itinerary his wife, Barbara John, and their two children would take on a vacation which was planned to begin in the next several days, and which also listed the make, model and year of the automobile Barbara John would be driving, and which also listed the location and names of motels where Barbara John and their children would be likely to stay during said vacation;

"7. Clinton W. John on June 6, 1981, gave an in-

dividual purporting to be a killer for hire pictures of the two John children so they could be identified by said individual and would not be harmed in any attempts to murder Barbara John by said individual; and

"8. Clinton W. John met with an individual purporting to be a killer for hire on June 6, 1981, at about 4:30 p.m. in the area of the Interstate Holiday Inn in Hall County, Nebraska, and agreed to have said individual telephone him in 30 days to further discuss the murder of Barbara John by said individual."

The State introduced evidence which tended to establish the following facts. On June 4, 1981, the defendant John and his wife, Barbara, were separated and an action for divorce was pending. John operated a business in Grand Island, Nebraska, and at that time lived at his place of business in an office which he had converted into a bedroom. On about June 3, 1981, the defendant John had dinner with an acquaintance from Minnesota, one Hanauer, and two other men, apparently Grand Island residents. Hanauer made a hobby of gun collecting, as did John.

Hanauer testified that, following the dinner, John approached him in private and said that he had a problem but did not want to discuss it at that time and asked Hanauer to come by the office the next day. Hanauer went to John's office the next morning as requested. At that time a conversation occurred between them. According to Hanauer, John asked him if he knew where he could get an unregistered gun and where he could find someone to dispose of his wife. To the latter question Hanauer answered "No." At that time John said, "This conversation is now ended." Hanauer stated that as they walked to the door he became nervous and frightened. His thought, as indicated by inference from later testimony, apparently was that, since John had disclosed a possible intention to mur-

der his wife, he (Hanauer) might himself be in danger if the plan were actually carried out. At that time he turned to John and said, "Well, maybe I do know somebody." He then asked for John's card, and John gave him two. Hanauer testified that the more he thought about the matter the more concerned he became. He returned to Minnesota that day. When he reached home he called the sheriff's department, made an appointment for the following day, and disclosed the nature of his conversations with John.

At trial John, who took the stand in his own behalf, did not deny that a conversation had taken place in the office which he had converted into a bedroom, but gave a different version of the conversation and gave it different import. John stated he knew that Hanauer had a gun collection worth millions and that he asked Hanauer only three questions. John testified, "[M]y first statement to him was, 'You know a lot of people that have guns'. His answer was, 'Yes'. . . . I then asked him, I said, 'Do you know people that use guns'. His answer was, 'Yes'. . . . The third question I asked Mr. Hanauer was, 'Do you know people that use guns to eliminate people'. Q. What was his response? A. His response was an emphatic, 'No'. With that I said, 'Fine'. I then opened the door and started to leave my office. Then, as the door was opened and he was about out of the door he said, 'Wait a minute'. So I turned around, closed the door and he said, 'I might know somebody that knows somebody'. I might add that at no time during the conversation did I ever mention my wife, not her name or anything to do with our upcoming divorce. Q. Mr. John, what was your purpose in asking the man these questions? A. Basically, my purpose was to ask him these questions in regard to the same weapons that I had requested information from him and had never gotten, previously on the old — to use the names of the weapons, they're the American Thompson sub-

machine gun, the British Sten gun, I believe it's called and the German Burp gun. Basically, these were guns used in the Second World War by our troops when they went in against the Germans in Europe?'' John admitted that on that occasion he might have given Hanauer one or more business cards, although he was sure that he had previously given Hanauer business cards also.

Hanauer kept the appointment with the St. Cloud, Minnesota, sheriff's department and advised one of the sheriff's deputies of his conversation with John. He told the officer that he wanted no part of the matter and related his fear for his own safety. The deputy to whom Hanauer spoke then, with Hanauer's knowledge, contacted the Hall County sheriff's office, told the sheriff's deputy of the information he had received, and later transmitted, with a memo, one of the business cards which Hanauer stated he received from John.

Upon receipt of this information the Hall County sheriff's department contacted a sergeant at the criminal investigation division of the Nebraska State Patrol. Between them it was decided that an undercover agent of the State Patrol should play the part of a hit man who had been contacted by Hanauer and get in touch with John. This was done immediately and a telephone conversation between John and the undercover agent Zeleski, a regular employee of the State Patrol, took place. There were subsequent telephone conversations and meetings between the two. With the exception hereinafter noted, all of these conversations were tape recorded and later transcribed. Zeleski supervised the transcription by listening to the tapes, supplying parts which were inaudible, and, as will be observed, supplying parenthetical material. Both the tapes and the transcriptions were received in evidence at the trial, with the foundation being laid by the testimony of Zeleski. These conversations and meetings constitute the basis of the various overt

acts (with the exception of the first, i.e., John's handing the business cards to Hanauer) charged in the information. The meetings between the two were corroborated by the surveillance of an officer of the Nebraska State Patrol and photographs which were taken. In addition, one of the conversations at a meeting between Hanauer and John was monitored by a remote receiver.

We summarize and/or quote the contents of the conversations that took place at the various meetings between John and Zeleski. The first was a telephone conversation which occurred on June 5, 1981, at about 9:15 p.m., when Zeleski called John at his place of business. The following is a verbatim transcription of the recorded conversation:

"Mr. John: Hello.

"Inv. Zeleski: Yes, Mr. John?

"Mr. John: Yes.

"Inv. Zeleski: Ah, you don't know me, but I was contacted this morning, ah, by well, let's say a friend of a friend from Minnesota.

"Mr. John: Uh-huh.

"Inv. Zeleski: Who stated that you were having some problems that I might be able to help you with. I understand that you were becoming a little bit tired of sleeping in your office.

"Mr. John: That's right.

"Inv. Zeleski: And ah, he stated that, ah, I should contact you and visit with you and ah, I might possibly be able to help you with your situation.

"Mr. John: I think you may very possibly could. Now, the best thing, ah, are you calling long distance?

"Inv. Zeleski: Yes, I am.

"Mr. John: OK. Ah, you have my card?

"Inv. Zeleski: No, I, I haven't, ah, seen the card or anything. I was contacted by telephone. Ah.

"Mr. John: Oh, I see. OK.

"Inv. Zeleski: Tell ya, I'm going to the west coast. Have to be there by the middle of next week.

"Mr. John: That, that's all very.

"Inv. Zeleski: You are in Grand Island, Nebraska, is that correct?

"Mr. John: Right. All this fits in very beautifully.

"Inv. Zeleski: OK, ah, I can probably be in Grand Island sometime, ah, oh, I think probably after noon tomorrow. Sometime in the afternoon, I believe.

"Mr. John: Sometime after noon tomorrow, that will be fine. You have my phone number, give me a call. I'll either meet you at the airport and ah, we can discuss things then or ah, wherever you want to meet."

They then made arrangements for a call back by Zeleski to John's office between noon and 2 p.m. The conversation then continued:

"Inv. Zeleski: Then, when I get you, I'll, we can make arrangements to get together.

"Mr. John: You bet. That would be wonderful.

"Inv. Zeleski: OK?

"Mr. John: Very good.

"Inv. Zeleski: We'll talk later.

"Mr. John: Thank you."

The followup conversation occurred on June 6, 1981, at 1:36 p.m. In that conversation the parties arranged for the time and place for a personal meeting. They agreed upon the parking lot at the Interstate Holiday Inn. Zeleski gave information by which John could identify him. The telephone conversation continued:

"Inv. Zeleski: If, if, ah, you could maybe bring a picture of your problem along and ah, possibly get ahold of Mr. Green and get some expense money, we can probably get things started here pretty quick.

"Mr. John: OK, fine. Ah, I was just trying to think about the picture here, where I might get one, here. Well, let me, let me worry about that, I'll, anyway about 2:15?

"Inv. Zeleski: Ya, there abouts.

"Mr. John: I'll catch you out there, then."

The meeting was kept as arranged. Zeleski suggested they go for a ride and asked if John objected. We now quote from the transcript:

"Mr. John: Hell, no. That's why I tried to bring one of our company pickups and we've got this old rough and ready that I always drive, drive in. Nobody knows that I'm just going out to help a man fix a tractor.

"Inv. Zeleski: There you go!

"Mr. John: Chain saws in back.

"Inv. Zeleski: Shit, little cars, damn things. (inaudible) Well, I was contacted like I said, by a, we'll just say a friend of a friend.

"Mr. John: Ya, ya, there is no sense of going into that now.

"Inv. Zeleski: You can give me the details when we get into it."

Zeleski then indicated he would need money. We again quote from the transcript.

"Mr. John: (interrupting or talking at the same time — I'm not, I'm not) See, the best part of it is you don't have to stay in town.

"Inv. Zeleski: Well, I don't.."

John then explained he could not get a picture of his wife as he never carried one, but he would furnish a picture of the two children. He then furnished Zeleski with an itinerary of the vacation which his wife and children were about to take, which itinerary he had secured from his son. We now return to the transcription:

"Mr. John: I just copies down what he gave me and ah — because my wife wants me to know as little as possible, and ah, but anyway these are what she gave him to give to me.

"Inv. Zeleski: Why don't you read that to me.

"Mr. John: OK.

"Inv. Zeleski: I gota [sic] drive here.

"Mr. John: Leaving Monday morning and, ah — they plan to be in Raton, New Mexico Monday night. They plan to be in Santa Fe Tuesday thru Thrusday

[sic], and in the Grand Canyon Friday thru Sunday. Then driving home on Monday or Tuesday. Then, she has written here, will call Grandad when we know where we're staying. Now that's her father, but I am sure ah, they might tell me, but, ah, then again they might not.

"Inv. Zeleski: All right.

"Mr. John: Then she has written underneath that — possibly the La Pasada, anyway, Inn in Santa Fe and the Grand Canyon Lodge in the Grand Canyon. OK, here is what they drive. She'll be driving a 1977 white Granada four-door sedan with a maroon vinyl top with a bike rack on the back with one or two bikes, probably a 10-speed, a burgandy [sic] colored 10-speed, and, ah, one of these new red racing bikes that my son races, you know bicycles.

"Inv. Zeleski: OK.

"Mr. John: And the license number on the car is 8-3888.

"Inv. Zeleski: You want to, ah, either on that or on this or something, write down a physical description of her.

"Mr. John: Five foot one.

"Inv. Zeleski: You don't have a picture of her in the house or anything?

"Mr. John: Well, there in the house but I can't get in the god damn house until, till after they leave.

"Inv. Zeleski: You want to write down what she looks like, so I will have it. I mean cause, I don't know, you know.

"Mr. John: Ya."

John then gave Zeleski a general description of Mrs. John and wrote it on the back of the itinerary. He then gave Zeleski pictures of the children, stating he did not want either of them involved and that he wanted the pictures back eventually. The conversation continued:

"Inv. Zeleski: Is there anything in particular you had in mind, ah, that, ah.

"Mr. John: Well when you, when you say — like had in mind.

"Inv. Zeleski: Well, to, like you know.

"Mr. John: Well, if it could be made to look like an accident, fine. So much the better is all I'm getting at.

"Inv. Zeleski: What do, ya, a traffic accident, you mean.

"Mr. John: Traffic accident, a holdup in a store, ah, somebody shot by mistake, etc. etc. If you see what I am getting at.

"Inv. Zeleski: OK, sure. Now is she going to be traveling at anytime, do you know, by herself without the children?

"Mr. John: This, I don't know. This is why my son is taking his bicycle. I doubt.

"Inv. Zeleski: Do you have relation or does she have relation down there or anything, or anything? Huh?

"Mr. John: None (pause)

"Inv. Zeleski: Um?

"Mr. John: At least if she does, there is none that I've known about. I take it you don't smoke?

"Inv. Zeleski: Oh, go ahead. I used to, but I started losing my wind so I had to quit. (laughs) Well, let me ask you this, the way, the way this situation is, ah, do you just as soon that, that she got out of town?

"Mr. John: Absolutely, the farther, the farther away, the better. Because, see whats happened, to give you a brief rundown. . . ."

Then followed a recital by John of his marital troubles, including what he referred to as his wife's unreasonable financial demands and John's expression of opinion that the judge might yield to them. The conversation then turned to charges for Zeleski's services.

"Mr. John: Oh, I am not, I am not asking, I was just trying to get you to give me basic lump, to know what I have to come up with, cash dollars. Be-

cause that is the only way you probably want it anyway.

"Inv. Zeleski: Ya. I don't take Mastercharge.

"Mr. John: No, no Mastercharge or checks or anything else, and first of all, I wouldn't want to give it to you that way because then the son-of-a-bitch is traceable.

"Inv. Zeleski: Ya. I am going to have to have a $1000 to start with.

"Mr. John: Uh-huh.

"Inv. Zeleski: Ah, with the ah, traveling, I'm going to have to, to, ah, you know, I, I want to, I am going to be honest with you, I am not going to take you for a ride.

"Mr. John: Well, hell, ya.

"Inv. Zeleski: I got no, I got no reason.

"Mr. John: Hell no, this is, this is your.

"Inv. Zeleski: I need a $1000 and as soon as I get that, I will get started. I like to get things over with as fast as I can.

"Mr. John: Uh-huh.

"Inv. Zeleski: And be on my way. So, $1000 when I get started and if my expenses [sic] over that, you cover the balance of the expenses when I'm done, the other thousand dollars.

"Mr. John: Uh-huh.

"Inv. Zeleski: And ah, you know, if the expenses, you say run over $500, ah..

"Mr. John: You mean, you talk about running over the two thousand or so?

"Inv. Zeleski: Well, I'm figuring $500 expenses out of the first $1000.

"Mr. John: Ya.

"Inv. Zeleski: Then, if they run over that..

"Mr. John: Well, I can, I can understand your position, ya..

"Inv. Zeleski: You know, I'll ah, contact you and you know, because you — hey, I am not, I, I am not, a fortune teller, I don't know what is going to happen here.

"Mr. John: Well, no, hell no.

"Inv. Zeleski: I've got to have money to operate on. That's it.

"Mr. John: OK."

John then began a discussion with Zeleski of the possibility of just "riding it out," that is, taking a chance that the judge in the divorce action would not grant Mrs. John's financial requests. That discussion continued for some minutes. The tape then ran out and the balance of the conversation was not recorded. Zeleski testified that he realized when the recording ran out because the recorder emits a whine, which he covered by fiddling with the radio. He testified to the balance of the conversation, which related to the total amount of $2,000 that Zeleski would charge and the methods to be used. John expressed fear of blackmail by Zeleski at a later time and received assurances from Zeleski. Zeleski discussed specific methods by which the slaying might be carried out. John stated he wanted the children kept out of it. No method was agreed upon. They then agreed to a meeting later that day at 4:30 p.m.

The continuation meeting between John and Zeleski was held as scheduled. After some introductory remarks, the following conversation took place, as indicated by the transcription:

"Mr. John: Well, anyway, I think what I am going to do is, I'm gonna ride this son-of-a-bitch out, and wee [sic] what the hell happens and ah, the only thing that worries me is, ah, how the hell I can get ahold of you (inaudible).

"Inv. Zeleski: Well.

"Mr. John: The same route.

"Inv. Zeleski: I could have somebody call you, you know, whatever you want.

"Mr. John: Well, lets just, lets just put it a month from now. OK, now, would it be best that I got the pictures back and that stuff.

"Inv. Zeleski: Yes, if you want them.

"Mr. John: Ya, why don't I, cuz those are the only things I, keep the itinerary if you want it. I don't need it, I have a copy of it.

"Inv. Zeleski: Well, if you, ah you know, if you want me to do something yet this week (inaudible), ah, well if you don't want me to do anything, I am just going to go ahead and go out west. You know, ah.

"Mr. John: Well, for right now, for right now, I would say that's the way, that's the way it would stand, but, ah, see I am so god damn involved here in Grand Island that, ah, I am talking about the meetings, you know, and all that shit. The timing, even if it was here T.J., would make no difference at all. I'd have better, I'd almost have better cover then [sic] I would if something happened there, you follow me?

"Inv. Zeleski: Ya."

John then indicated to Zeleski that he (John) would check with his attorneys to find out how the divorce settlement was going. Then followed this statement:

"Mr. John: If, ah, if we can, I, I don't, let me put it this way, I sure as hell don't want to lose ya. Ah.

"Inv. Zeleski: Well.

"Mr. John: But, ah —

"Inv. Zeleski: Well, you can, you want me to contact you, whenever, 30 days from today?

"Mr. John: Let's just make it that way and see what the hell is going on."

After a rather meandering conversation they concluded that Zeleski would contact John in 30 days, with Zeleski saying, "if you want to call it quits," it was OK, but that he would want to get his expense money. To this John replied, "OK." Later in the conversation John was apologetic for not having money with him as he usually did, explaining that on Saturday afternoon he could not cash a check. The conversation then continued on a social note, with John inviting Zeleski to go fishing with him and his

buddies anytime. They parted with Zeleski saying, "Don't do anything for Christ's sakes."

When John, at trial, took the stand on his own behalf he did not deny the various meetings with Zeleski or challenge the contents of their various conversations. He explained that he was astounded when he received the first call from Zeleski. He explained his consenting to and his participation in the meetings with Zeleski by stating that he was curious to find out what a hit man was like.

It is apparent, however, the jury did not accept John's explanation, and that seems quite understandable in light of the fact that it is perfectly clear, despite the ambiguity of Zeleski's first approach to John, that John realized he was being contacted by a hit man. John also testified that after his first conversation with Zeleski he discussed the matter with two advisers, who told him to have nothing to do with the fellow. He testified he disregarded the advice because of his curiosity. John did not attempt to offer the testimony of these two advisers.

The defendant's first assignment of error contains two contentions, namely, (1) there was insufficient evidence to establish the agreement and (2) no conspiracy can exist when one of the parties is feigning the agreement. The basis for the State's charge of conspiracy is clearly founded upon the conversation between the defendant and Hanauer on June 4, for that is the date stated in the information.

Which version of the conversation the jury might have believed and whether the agreement, if made, constituted an agreement between John and Hanauer that "one or more of them shall engage in or solicit the conduct or shall cause or solicit the result specified," to wit, the first degree murder of Barbara John, need not have been viewed by the jury solely on the basis of what occurred in the transaction which allegedly constituted the agreement, but also in the light of the defendant's subse-

quent conduct. The rule in Nebraska is that the nature of the agreement may be inferred from the defendant's conduct subsequent to the agreement and to the circumstances surrounding it and may be proved by circumstantial evidence. *Beyl v. State,* 165 Neb. 260, 85 N.W.2d 653 (1957); *State v. Knecht,* 181 Neb. 149, 147 N.W.2d 167 (1966); *United States v. Hayutin,* 398 F.2d 944 (2d Cir. 1968). The function of the overt act in a charge of conspiracy is simply to manifest that the conspiracy is still at work. *Yates v. United States,* 354 U.S. 298, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 (1956).

Disregarding for the moment the fact that Hanauer was feigning the agreement, the jury was entitled, under the above authority, to consider John's subsequent conduct in determining whether an agreement existed and the nature thereof. We hold that the evidence was sufficient for the jury to determine beyond a reasonable doubt that John and Hanauer entered into an agreement which John understood was an agreement by Hanauer to "solicit" a hit man for the purpose of carrying out the first degree murder of Barbara John. Under the provisions of the plain language of § 28-202, the agreement may be either to "engage in" the conduct or "solicit" the conduct. Hanauer's version of the conversation and John's subsequent conversations and transactions with the "hit" man, if believed by the jury, do establish that John agreed to have Hanauer solicit someone to murder his wife.

We now turn to the second question of whether, under the provisions of § 28-202, two people must actually agree to the criminal conduct necessary to constitute the first element of a conspiracy, or whether agreement by the defendant and a feigned agreement by the alleged coconspirator is sufficient. Prior to the adoption of § 28-202 in 1977, the Nebraska statute defining a conspiracy read: "If *two* or more persons conspire to commit any felony . . . and one or more of such parties do any act to effect the

object of the conspiracy . . . ." (Emphasis supplied.) Neb. Rev. Stat. § 28-301 (Reissue 1975). It is not controverted that under the former statute the conspiracy or agreement must be actual and made by two or more people. The State takes the position in this case that under the provision of § 28-202, which was adopted from Model Penal Code § 5.03 (Tentative Draft No. 10, 1960), the unilateral approach of the agreement element of conspiracy has been adopted, and under that approach only the defendant need agree with another; the second party can feign the agreement and the conspiracy may exist.

There are significant differences in the language of the two statutes. The former provided, "If two or more persons conspire . . . ." The present statute says, "A person shall be guilty . . . if, with intent . . . (a) He agrees . . . ." The commentary to § 5.03 of the Model Penal Code, *supra* at 104-05, says: "2. *The Conspiratorial Relationship.*

"*Unilateral Approach of the Draft.* The definition of the Draft departs from the traditional view of conspiracy as an entirely bilateral or multilateral relationship, the view inherent in the standard formulation cast in terms of 'two or more persons' agreeing or combining to commit a crime. Attention is directed instead to each individual's culpability by framing the definition in terms of the conduct which suffices to establish the liability of any given actor, rather than the conduct of a group of which he is charged to be a part—an approach which in this comment we have designated 'unilateral.'

"One consequence of this approach is to make it immaterial to the guilt of a conspirator whose culpability has been established that the person or all of the persons with whom he conspired have not been or cannot be convicted. Present law frequently holds otherwise, reasoning from the definition of conspiracy as an agreement between two or more persons that there must be at least two guilty con-

spirators or none. The problem arises in a number of contexts.

. . . .

"*Second:* Where the person with whom the defendant conspired secretly intends not to go through with the plan. In these cases it is generally held that neither party can be convicted because there was no 'agreement' between two persons. Under the unilateral approach of the Draft, the culpable party's guilt would not be affected by the fact that the other party's agreement was feigned. He has conspired, within the meaning of the definition, in the belief that the other party was with him; apart from the issue of entrapment often presented in such cases, his culpability is not decreased by the other's secret intention. True enough, the project's chances of success have not been increased by the agreement; indeed, its doom may have been sealed by this turn of events. But the major basis of conspiratorial liability— the unequivocal evidence of a firm purpose to commit a crime—remains the same."

A number of states have adopted the Model Penal Code language. The following cases, among others, hold: Under a statute providing that if a person conspires with another to commit a crime, and in furtherance of the conspiracy one or more of the parties does some overt act in furtherance of such conspiracy, he may be guilty of conspiracy even though the person with whom he conspired feigned agreement and at no time intended to go through with the plan. *State v. St. Christopher,* 305 Minn. 226, 232 N.W.2d 798 (1975); *State v. Marian,* 62 Ohio St. 2d 250, 405 N.E.2d 267 (1980); *Garcia v. State,* ____ Ind. ____, 394 N.E.2d 106 (1979).

We believe it is clear that § 28-202 adopts the unilateral approach.

The defendant argues that our Legislature did not adopt the unilateral approach because it did not also adopt Model Penal Code § 5.04 (Proposed Official

Draft, 1962), which reads in part as follows at 86: "(1) Except as provided in Subsection (2) of this Section, it is immaterial to the liability of a person who solicits or conspires with another to commit a crime that: (a) he or the person whom he solicits or with whom he conspires does not occupy a particular position or have a particular characteristic which is an element of such crime, if he believes that one of them does; . . . ." An examination of § 5.04 indicates that its language does not support the defendant's position and is, in fact, irrelevant to the unilateral approach as set forth in our statute. Section 5.04 pertains only where the person whose status is an element of the crime does not occupy a particular position or have a particular characteristic which is an element of the crime, if he believes that one of them does. That language is quite consistent with the unilateral approach and, in fact, carries it a step further. It provides that the unilateral approach applies even when one of the necessary elements of the contemplated crime which is the object of the conspiracy may be missing. For example, assume a crime of conspiracy to bribe a public official. The effect of § 5.04 of the Model Penal Code would be that the crime is committed if the defendant only believes the person to be bribed holds the requisite office, but in fact does not. Apparently our Legislature did not wish to change the substantive element of crimes other than conspiracy and hence did not adopt § 5.04. The defendant's contention that the evidence is insufficient to support the verdict is not meritorious.

The defendant's second assignment of error is wholly frivolous. The trial court did define the crime in the exact language of the statute.

In determining the merits of the defendant's third assignment, it becomes necessary to discuss the nature of an overt act. An overt act is such as tends to show the preexisting conspiracy. *Platt v. State,* 143 Neb. 131, 8 N.W.2d 849 (1943). It is an outward act

done in pursuance of the conspiracy and manifests an intent or design looking toward the accomplishment of the crime. *Chavez v. United States,* 275 F.2d 813 (9th Cir. 1960). It need not of itself have a tendency to accomplish the object of the conspiracy. *Hall v. United States,* 109 F.2d 976 (10th Cir. 1940). It need not be an act which is criminal in itself. *Yates v. United States,* 354 U.S. 298, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 (1957); *Braverman v. United States,* 317 U.S. 49, 63 S. Ct. 99, 87 L. Ed. 23 (1942). See, also, *Collier v. United States,* 255 F. 328 (5th Cir. 1918); *United States v. Sarno,* 456 F.2d 875 (1st Cir. 1972); *State v. Stanley,* 123 Ariz. 95, 597 P.2d 998 (1979).

The various overt acts charged in the information, all of which find support in the evidence, are, in the light of the principles cited, overt acts within the meaning of the law, and the court did not err in submitting them to the jury. We will discuss just a few of the acts charged. The giving of the business cards with name, address, and telephone number of John afforded to Hanauer a convenient means for the hit man or Hanauer to later contact John. The meetings with the alleged hit man were clearly overt acts. The furnishing of the vacation itinerary of Barbara John, the description of her car, and her physical description were actual steps toward accomplishment of the ultimate purpose.

Assignment (4) is inherent in assignment (1) and has already been disposed of.

Although not specifically assigned as error, the defendant argues that the information was insufficient and should have been quashed because it did not identify the alleged coconspirator. The motion to quash was based upon the allegation that the information stated no crime, for the reason the statute was unconstitutional because the statute was vague and indefinite. The motion to quash did not raise the issue of a defect in the information for failure to name the coconspirator. On the same day the mo-

tion to quash was overruled, the defendant entered a plea of not guilty. The applicable rules are: An information charging an offense in substantially the words of the statute is generally sufficient. All defects that may be excepted to by a motion to quash are taken to be waived by a defendant pleading the general issue. *State v. Abraham,* 189 Neb. 728, 205 N.W.2d 342 (1973). The defendant's contention that the information should have been quashed because of failure to allege the identity of the coconspirator is without merit.

As to the claimed multifarious errors listed in assignment (5), which allegedly prevented the defendant from having a fair trial, we conclude, after carefully examining the whole record, that either the alleged errors were not error at all, were not raised by proper objection, or were beyond a reasonable doubt not prejudicial and could not have affected the outcome of the trial.

AFFIRMED.

McCOWN, J., participating on briefs.