STATE OF NEBRASKA, APPELLANT, V. JIM L. CLASON, APPELLEE.
STATE OF NEBRASKA, APPELLANT, V. LEE A. CLASON, APPELLEE.

Filed November 22, 1994.    Nos. A-93-1040, A-93-1041.

This opinion has been ordered permanently published by order of the Court of Appeals dated January 12, 1995.

526 N.W.2d 673

Don Stenberg, Attorney General, Kimberly A. Klein, and David Arterburn for appellant.

No appearance for appellees.

SIEVERS, Chief Judge, and HANNON and MUES, Judges.

HANNON, Judge.

The defendants, Jim L. and Lee A. Clason, were separately charged in Furnas County, Nebraska, with conspiracy to distribute methamphetamine. The defendants were tried together, and at the close of the State's evidence, the trial court granted the defendants' motion to dismiss. The State appeals under Neb. Rev. Stat. § 29-2315.01 (Cum. Supp. 1994). The defendants in this proceeding have already been placed in jeopardy, and their acquittal in the prior proceeding cannot be reversed. The issues raised in this appeal are the sufficiency of the evidence and whether the Wharton Rule precludes a conspiracy charge against one of the defendants. We conclude that the evidence was sufficient to submit the cases against both defendants to the jury and that the Wharton Rule does not limit prosecution in these cases.

## CONSPIRACY CHARGES

In summary, the informations allege that between August 15, 1991, and February 12, 1992, the defendants or other unnamed coconspirators agreed that "they or one of them [would] engage in or solicit the unlawful, knowing or intentional distribution, delivery, dispensation, or possession with intent to deliver or dispense a controlled substance, to wit: Methamphetamine." For a shorthand expression in this opinion, we will call this drug by one of its street names, "crank." The informations allege 11 overt acts were committed pursuant to the conspiracy: (1) Between October 1 and 29, 1991, Jim Clason told Randall Johnson he would obtain crank for him for $150 in advance. (2) On October 29, Jim Clason described to Johnson the methods by which Jim Clason could obtain crank. (3) On October 31, Johnson delivered $150 to Jim Clason to purchase one-eighth ounce of crank. (4) Between October 31 and November 11, Jim Clason transferred the $150 to an employee of Clason Trucking Company, who gave it to Lee Clason. Lee Clason purchased crank with the money in California and attempted to deliver it to Johnson in California. At Johnson's request, Lee Clason transported the crank to Nebraska. (5) Between October 31 and December 18, Lee Clason delivered the crank intended for

Johnson to Jim Clason. (6) On December 18, Jim Clason discussed obtaining additional crank for Johnson. (7) On December 18, a truck driven by Lee Clason was stopped and searched in Harlan County, Nebraska, and a quantity of crank was found in the sleeper. (8) On December 27, Lee Clason and Johnson discussed the possibility of Lee Clason's obtaining crank for Johnson. (9) Between November 1 and 30, Allen Shepherd, a Clason Trucking driver, paid Jim Clason between $150 and $175 to be used to purchase crank. Jim Clason transferred this money to Lee Clason, who purchased crank and delivered it to Jim Clason in Furnas County, who then delivered it to Shepherd. (10) Between December 1 and 25, Shepherd purchased crank from Lee Clason in Beaver City, Nebraska. (11) On October 3, an associate of Jim Clason's wired money to Shepherd in California, who gave it to Lee Clason to purchase crank.

## STATEMENT OF FACTS

The trial before a jury commenced on October 19, 1993, and ended on October 25, when the trial judge granted the defendants' motion to dismiss after the prosecution rested.

The issues before the court are whether the evidence is sufficient to have submitted the cases against the defendants to the jury and whether the Wharton Rule precludes a conspiracy charge against Jim Clason. The following is a summary of the evidence in a light most favorable to the State:

In 1992, Clason Trucking was a partnership owned by Eugene and Ruth Clason, the defendants' parents. The firm owned and operated several large semi-trailer trucks equipped to carry livestock. Ruth Clason acted as a dispatcher for the firm. Jim Clason acted as the shop foreman in the firm's truck barn in Beaver City, where the trucks were maintained. Lee Clason drove a truck for the firm. Clason Trucking typically transported hogs from Phillipsburg, Kansas, to Farmer John's packing plant in Los Angeles, California.

In order to protect the hogs from the desert heat and stress on the trip to California, the drivers would leave Phillipsburg at approximately 1 a.m. and make the 1,460-mile trip in approximately 30 hours. The drivers regularly exceeded the

speed limit, and they made only four or five short stops on the trip. This schedule violated the applicable Interstate Commerce Commission regulations regarding the amount of rest a driver must have. The drivers used crank to remain alert while maintaining their rigorous work schedule.

After unloading at Farmer John's, the trucker would go to a certain motel to rest to the extent possible and await instructions from the dispatcher on a possible return load. Usually a load was arranged for at least part of the return trip, but frequently a truck would return to Nebraska empty.

Johnson had worked for Clason Trucking for about 6 weeks when, on October 28 or 29, 1991, Jim Clason told Johnson that he had truckdrivers take money with them, buy crank in California, and then bring it back to Nebraska. He told Johnson he had some people who were going to California at that time, and he asked him if he wanted to buy some crank. Johnson told him he did not have the required $150 with him. Through intermediaries, Johnson got in touch with an Officer Bodeman of the McCook, Nebraska, Police Department. On October 29, Johnson told Bodeman that Clason's truckers were trafficking in crank. Bodeman had Johnson call Jim Clason at his residence in Beaver City. A tape recording of that conversation was introduced into evidence.

In the course of that conversation, Johnson made tentative arrangements with Jim Clason to purchase some crank the next time he saw him. Jim Clason stated an "eight ball" of crank would cost Johnson $150.

On October 30, Jim Clason called Johnson to take a truckload of hogs to Los Angeles. He was to leave for California on November 1. Arrangements were made to wire Johnson for sound before he went to Beaver City on the afternoon of November 1. The police gave Johnson $250 for purchase money, and during the visit, Johnson gave Clason $150 of the money for the purchase of crank. In that conversation, Clason did not mention where he was going to get the crank.

A few days later, while on a trip for Clason Trucking, Johnson met with Lee Clason at the motel in California. Johnson testified: "We discussed he didn't have the money with

him. Somehow or the other it didn't get sent with him, but it was on the way out with one of the other drivers that was going to be there real shortly." The other driver, Shepherd, arrived later with the money. Later, Johnson saw Lee Clason at a truck wash in Barstow, California. Lee Clason said he had gotten the crank he was supposed to pick up for Johnson, and he asked Johnson if he wanted it. Johnson said no because he did not want to carry it back in his truck. Lee Clason told Johnson he, Lee Clason, was supposed to take it back and give it to Jim Clason. At that time, Johnson saw what Lee Clason represented as crank, and it looked like crank to Johnson. They then drove their respective trucks back toward Nebraska.

Johnson's next conversation on the subject of the drug he had purchased was with Jim Clason when Clason asked if Johnson wanted to sell back part of the eight-ball he had purchased. Johnson told him no.

A recorded telephone conversation between Jim Clason and Johnson on November 13 shows that Jim Clason knew Johnson was to receive some crank and that he owed it to Johnson. In the recording, Jim Clason tries to come up with some excuses as to why he does not have Johnson's crank. However, Jim Clason never really said why he did not give the crank to Johnson.

On December 18, after Johnson returned from a vacation, he met with Officer Bodeman and attempted to telephone Jim Clason from the McCook police station. In the attempt to reach Jim Clason, Johnson talked with Lee Clason. The telephone conversation was not recorded, but Johnson testified that Lee Clason told him that they had Johnson's crank. Nothing was said about how Johnson was going to get the crank that he had already paid for.

On December 18, Johnson and Officer Bodeman again went to Beaver City to the Clason truck barn in an attempt to get Johnson's crank from Jim Clason. Johnson was again wired for sound, and the recording was received into evidence. In that recording, Jim Clason stated that he did not have Johnson's crank. Also in the conversation, Johnson said that he had a new job that started at the beginning of the year. Jim Clason stated that the crank was only for Clason Trucking's drivers and that it

was not for everybody in the county. Jim Clason said he was not sure if the other drivers would be willing to bring back any crank for Johnson, but that it would be up to them. At various points in the conversation, Jim Clason said that he would return Johnson's $150.

In a final attempt by Johnson to obtain the crank that he purchased from Jim Clason, Johnson telephoned Lee Clason on December 27 from the McCook police station. This conversation was recorded and received into evidence. During the course of this conversation, Lee Clason said he was unhappy with Johnson. He stated he suspected Johnson had set him up for the search of his truck that occurred in Harlan County. After Lee Clason was apparently convinced that Johnson was not the one who turned him in, he told Johnson his truck was searched twice, and only a trace of crank was found. Lee Clason stated that the officers who performed the search missed a bag of crank that was lodged between the wall and the mattress of the truck cabin.

Johnson never did receive the crank that he had purchased from Jim Clason, nor did he get back the $150.

Shepherd testified that he drove trucks for Clason Trucking for the period from September 9, 1991, to February 12, 1992, before he was arrested in Texas when crank was found in his truck. He stated that he saw Jim Clason use crank "more times than he could count," and on at least 10 occasions, Jim Clason shared some with him. On 20 to 40 occasions, he saw Lee Clason with what appeared to be crank, and Lee Clason shared crank with Shepherd on perhaps 20 occasions.

Shepherd testified that on approximately October 1, 1991, Jim Clason had someone in Kearney, Nebraska, wire $558 to Shepherd in California. Previously, Jim Clason had told Shepherd that when he received this money, he was to give it to Lee Clason for the purchase of crank. Upon receipt of the money, Shepherd gave that money plus $150 of his money to Lee Clason to purchase crank.

On one occasion in Beaver City, Shepherd gave Jim Clason $150 that he and several other drivers had pooled to purchase crank. Jim Clason said he would have either Lee Clason or Jim Schoenthal, another Clason driver, pick it up. A few days later,

Shepherd picked up the crank at Jim Clason's house. In December, Shepherd give Jim Clason $150 for crank. Jim Clason said Lee Clason was to pick up the drugs, but upon Lee Clason's return, Jim Clason told Shepherd that Lee Clason was too nervous to pick up the crank.

Ed Todd testified that he drove a truck for Clason Trucking from May to December 1991. He saw Jim Clason use crank once in Beaver City. He also saw Lee Clason in possession of an illegal substance in California while J.D. Hallsted, a Clason Trucking driver, was present. Todd and Hallsted pooled $75 each and gave it to Lee Clason. Lee Clason left in his truck and came back in about 2 hours with what appeared to be crank.

Hallsted testified that he drove a truck for Clason Trucking from September to December 1991. He stated that he saw Jim Clason use crank on about 10 occasions and that they used it together on one occasion in the shop in Beaver City. He saw Lee Clason with crank in California on more than one occasion. He confirmed Todd's testimony about their purchase of crank from Lee Clason. He testified that both Jim Clason and Lee Clason told him that Johnson had given them $150 to buy crank. Hallsted stated that Jim Clason said the crank was picked up and brought back but never delivered to Johnson because Jim Clason had used it himself.

## DISMISSAL OF THE CASE

In granting the defendants' motion to dismiss, the judge reviewed the evidence. In doing so, the judge stated the evidence established that the defendants and most of the witnesses used large amounts of crank, that the only attempted delivery of a drug to Johnson was in California; and that Johnson delivered $150 to Jim Clason to purchase crank, but after that the evidence "gets a lot more murky." The judge stated there is no agreement he could find with Lee Clason. The judge then referred to a couple of statements Jim Clason made which, if believed, could tend to establish he had not talked to Lee Clason about his getting crank and to a statement Lee Clason made in December 1991 to the effect that Johnson would have to talk to Jim Clason to get his money back. The judge stated that distribution of crank required at least two people.

"Therefore, the Wharton Rule in order to have a conspiracy we have to have three people." The judge also said that he believed the "cooperating individual cannot provide the overt acts that are necessary to complete the transaction." At least, the judge stated, that was his reading of *State v. John* (apparently 213 Neb. 76, 328 N.W.2d 181 (1982)). The judge stated that if "this was the type of conspiracy that only required two people, I would have no trouble finding Mr. Jim Clason guilty of conspiracy." The judge then considered whether there was evidence to support a finding of the 11 alleged overt acts. He found there was sufficient evidence to establish Nos. 1, 3, 6, 7, and 8 of the alleged acts, but he found insufficient evidence to support a finding of the other overt acts. In conclusion, he stated that "the state has failed to present sufficient evidence to allow the jury to find the defendants guilty beyond a reasonable doubt" and dismissed the cases.

## ASSIGNMENTS OF ERROR

The State alleges the trial court erred in the following respects: (1) applying the incorrect standard of proof, i.e., "beyond a reasonable doubt" in determining whether the case should be dismissed; (2) determining the Wharton Rule required dismissal of the case; and (3) unduly restricting the State's evidence by not allowing portions of testimony to be admitted regarding the stop and search of Lee Clason's truck in Harlan County.

## SCOPE OF REVIEW

Whether a trial court should have granted a motion for directed verdict at the close of the State's case is a question of law. Regarding a question of law, an appellate court is obligated to reach a conclusion independent of determinations reached by the trial court. *State v. Roche, Inc.*, 246 Neb. 568, 520 N.W.2d 539 (1994).

## DISCUSSION

*Evidentiary Standard.*

On a criminal defendant's motion to dismiss for insufficient evidence of the crime charged, the State is entitled to have all its relevant evidence accepted as true, the benefit of

every inference reasonably drawn from the evidence, and every controverted fact resolved in its favor. *State v. Stahl*, 240 Neb. 501, 482 N.W.2d 829 (1992); *State v. Grantzinger*, 235 Neb. 974, 458 N.W.2d 461 (1990); *State v. Pierce*, 231 Neb. 966, 439 N.W.2d 435 (1989). If, when viewed in this light, the State's evidence is sufficient to establish all the elements of the crime charged, a denial of the defendant's motion to dismiss is without error. *State v. Stahl, supra*; *State v. Jacobs*, 226 Neb. 184, 410 N.W.2d 468 (1987).

In a criminal case, a court may grant a defendant's motion to dismiss only when (1) there is a complete failure of evidence to establish an essential element of the crime charged or (2) the evidence is so doubtful in character and lacking in probative value that a finding of guilt based on such evidence cannot be sustained. *State v. Hankins*, 232 Neb. 608, 441 N.W.2d 854 (1989); *State v. Pierce, supra*; *State v. Diesing*, 231 Neb. 132, 435 N.W.2d 190 (1989).

The Nebraska Supreme Court has held that a prima facie case of conspiracy is a preliminary question for a trial court's determination concerning the admissibility of a coconspirator's acts. *In re Interest of M.L.S.*, 234 Neb. 570, 452 N.W.2d 39 (1990); *State v. Copple*, 224 Neb. 672, 401 N.W.2d 141 (1987). In *Copple*, the court stated that there is a distinction between proving conspiracy as a crime beyond a reasonable doubt and establishing conspiracy as a prerequisite and a means to achieve admission of an alleged coconspirator's acts and declarations as evidence, where only a prima facie showing of conspiracy is sufficient.

Once a conspiracy is established, wide latitude is allowed in presenting evidence, and it is within the discretion of the trial court to admit evidence which remotely tends to establish the conspiracy charged. *State v. McSwain*, 194 Neb. 31, 229 N.W.2d 562 (1975). The trial judge stated in his decision that he takes the view most favorable to the State when evaluating the evidence. However, in granting the motion to dismiss, the trial judge said, "the state has failed to present sufficient evidence to allow the jury to find the defendants guilty beyond a reasonable doubt."

While the trial judge is correct in taking the view most

favorable to the State, he erred by using the standard "beyond a reasonable doubt" on a motion to dismiss. As stated in Nebraska case law cited above, a trial judge may properly grant the defendant's motion to dismiss if the judge finds there was a complete failure of evidence to establish an essential element of the crime charged or if the judge finds the evidence to be so doubtful in character and lacking in probative value that a finding of guilt based on such evidence cannot be sustained.

There is no rule that instructs a court to direct a verdict and dismiss the State's case when in the opinion of the judge the jury could not find the defendant guilty beyond a reasonable doubt. The correct standard is stated above, and the court erred in applying that other standard. However, as stated above, the trial court also stated a summary of the correct rule. Whether a case should be dismissed at the close of the State's case is a question of law. Since we cannot tell which standard the trial judge did in fact apply, we feel constrained to determine if the trial judge should have dismissed the case under the correct rule.

*Crime Charged.*

Conspiracy is defined in Neb. Rev. Stat. § 28-202 (Reissue 1989), which states in relevant part:

(1) A person shall be guilty of criminal conspiracy if, with intent to promote or facilitate the commission of a felony:

(a) He agrees with one or more persons that they or one or more of them shall engage in or solicit the conduct or shall cause or solicit the result specified by the definition of the offense; and

(b) He or another person with whom he conspired commits an overt act in pursuance of the conspiracy.

(2) If a person knows that one with whom he conspires to commit a crime has conspired with another person or persons to commit the same crime, he is guilty of conspiring to commit such crime with such other person or persons whether or not he knows their identity.

(3) If a person conspires to commit a number of crimes, he is guilty of only one conspiracy so long as such multiple

crimes are the object of the same agreement or continuous conspiratorial relationship.

■ " ' "[A]n overt act, as something done pursuant to a conspiracy, tends to show a preexisting conspiracy and manifests an intent or design toward accomplishment of a crime. . . . An overt act, by itself, need not have the capacity to accomplish the conspiratorial objective and does not have to be . . . criminal . . . ." ' " *State v. Anderson*, 229 Neb. 427, 435, 427 N.W.2d 764, 770 (1988), quoting *State v. Lafler*, 225 Neb. 362, 405 N.W.2d 576 (1987).

The trial court found that 5 of the 11 overt acts were established. While we believe there was sufficient evidence to support a finding that additional overt acts were established, we will not go into detail in that regard, because one overt act is sufficient. On the issue of the sufficiency of the evidence, we are concerned only with whether the alleged conspiracy has been proved.

In granting the motion to dismiss, the trial judge did not clearly state what he understood the conspiratorial agreement to be. Some statements by the judge support the conclusion that he considered the conspiracy to be between the defendants and Johnson to have crank brought to Nebraska for Johnson. The agreement alleged in the informations was that "they or one of them [would] engage in or solicit the unlawful, knowing or intentional distribution, delivery, dispensation, or possession with intent to deliver or dispense" crank into Furnas County. The information was essentially in the words of the statute, and absent a motion to quash, an allegation in the words of the statute is generally sufficient. *State v. John*, 213 Neb. 76, 328 N.W.2d 181 (1982). Under § 28-202(3), a conspiracy may be an agreement to commit multiple crimes if the multiple crimes are the object of the same agreement or the same conspiratorial relationship.

■ In the case at hand, the alleged conspiratorial agreement is broad, and it is not limited to a specific agreement or agreements to bring crank from California on one or more specific occasion, but, rather, multiple crimes that are part of a conspiratorial relationship. "A conspiracy need not be established by direct evidence of acts charged, but may, and

generally must, be proved by a number of indefinite acts, conditions, and circumstances which vary according to the purposes to be accomplished." *State v. Cortis*, 237 Neb. 97, 112, 465 N.W.2d 132, 143 (1991). In this case, Jim Clason's conversations with Johnson, Shepherd, Todd, and Hallsted, in which he agreed to obtain crank for them at various times, plus the evidence that Lee Clason did overt acts and made statements in California and Nebraska, if believed, establish that Lee Clason was filling orders taken by Jim Clason. Lee Clason's actions as testified to by the other truckers, if believed, establish him as a member of that conspiracy, not simply that he purchased crank in California. The evidence would support a finding that some of the truckers were ordering and agreeing to purchase crank which was to be delivered to them in Furnas County and used by them there. They made this agreement with Jim Clason by ordering crank from him to be distributed in Nebraska. There is ample circumstantial evidence that Lee Clason frequently purchased crank in California for distribution and use in Nebraska through Jim Clason and that Lee Clason knew of this established procedure. Some, if not all, of the truckers showed they were part of the conspiracy by delivering money to California or by ordering, accepting, and using crank in Nebraska. The evidence would support a finding that Lee and Jim Clason, and others, knew of the entire arrangement and while knowing of that arrangement either ordered, took delivery of, paid for, or used crank which they knew was imported by an established but irregular procedure. The evidence establishes a continuous conspiratorial relationship to distribute crank in Nebraska. While the conspiracy charge was not limited to obtaining crank for the use of drivers for Clason Trucking, the evidence would support a finding that Jim and Lee Clason, and others, conspired to import California crank for that purpose.

We can find nothing in *State v. John, supra*, that would support a finding that Johnson's actions cannot be used to prove the conspiracy. However, even if one does not consider Johnson's actions as those establishing overt acts, there is ample other evidence of overt acts, as found by the trial court, which would be sufficient to establish them for purposes of

submitting the cases to the jury.

*Wharton Rule.*

To the extent the trial judge's ruling is interpreted as holding the Wharton Rule made it impossible to prosecute Jim Clason for conspiracy to deliver drugs, we do not agree.

The Nebraska Supreme Court recognizes the Wharton Rule, as adopted by the U.S. Supreme Court, as an exception to the rules of conspirator liability. *State v. Utterback*, 240 Neb. 981, 485 N.W.2d 760 (1992). Essentially, this rule precludes the prosecution of conspiracy when the number and identity of persons involved in the conspiracy are the same as the number and identity of persons required to commit the underlying substantive offense.

■ The classic formulation of the rule is as follows: "An agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission." 1 Ronald A. Anderson, Wharton's Criminal Law and Procedure § 89 at 191 (1957).

In *Utterback*, the question of the application of the Wharton Rule came before the court in the process of testing the reliability of an informant who supplied information used in a search warrant application. The informant's reliability was considered on the ground that the information he supplied the police was against the penal interests of the informant and therefore reliable. In *Utterback*, the statement the informant gave to the police would be against that informant's penal interests only if the admission that he had purchased marijuana from a certain party was an admission of a crime. The court noted that the purchase of marijuana was not statutorily proscribed. The statement might be against his penal interests if he could be guilty of conspiracy with the seller of the marijuana to deliver or distribute the marijuana to him. This is the classic case of a crime that is necessarily a two-party crime, and it was held he could not be guilty of conspiracy under the Wharton Rule.

The rationale for the rule is to avoid cumulative punishment for conspiracy and the completed substantive offense. While conspiracy and a substantive crime are generally separate

offenses, conspiracy is usually a lesser-included offense of a crime involving concerted criminal activity. *Iannelli v. United States*, 420 U.S. 770, 95 S. Ct. 1284, 43 L. Ed. 2d 616 (1975). Examples of such concerted criminal activity are incest, bigamy, adultery, and dueling. *Id*.

In *Utterback*, the Supreme Court noted in passing that the Wharton Rule does not apply to offenses that can be committed by one person, and in particular to the possession of a controlled substance with intent to deliver.

Another exception to the Wharton Rule is that a conspiracy charge may be filed if more or different people participate in the conspiracy than are necessary to commit the substantive offense. *Baker v. United States*, 393 F.2d 604 (9th Cir. 1968); *People v. Incerto*, 180 Colo. 366, 505 P.2d 1309 (1973). Thus, the Wharton Rule shields a conspiracy from prosecution only if the agreement is necessary to perfect the elements of the substantive crime. *People v. Incerto, supra*.

Another exception is that the Wharton Rule is inapplicable where the substantive offense has not yet been committed by any of the conspirators. See, *Iannelli v. United States, supra*; *United States v. Zeuli*, 137 F.2d 845 (2d Cir. 1943); *People v. Incerto, supra*. See, also, Wayne R. LaFave & Austin W. Scott, Jr., Criminal Law § 6.5 (2d ed. 1986). The rationale for this exception is that the Wharton Rule should *not* be allowed to operate in such circumstances because it would improperly immunize all of the defendants from being charged with conspiracy when the substantive crime involving concerted activity has not yet been committed. LaFave & Scott, *supra*.

This exception is not strictly applicable to the case at hand because the alleged conspiracy is not to commit only one crime. However, the exception would prevent the application of the Wharton Rule even if the alleged conspiracy was the delivery of crank to Johnson, because the crank was never in fact delivered to him. If the conspiracy charge against Jim Clason was to sell Johnson a drug, and the drug was actually delivered as the drugs were in *Utterback*, the Wharton Rule would prevent prosecution for conspiracy. However, that is not the conspiracy charged in the information, and the drug was not delivered to Johnson.

Allowing the rule to operate in the present case would

completely overlook the function of conspiracy as an inchoate crime. The fact that an offense requires concerted action for its commission is not a reason to completely immunize criminal preparation to commit it by barring prosecution for conspiracy. Model Penal Code § 5.04, comment (1985); Model Penal Code § 5.04, comments (Tent. Draft No. 10, 1960). The inchoate crime of conspiracy allows law enforcement agencies to intervene and protect the public from persons who reveal that they are disposed to criminal activity and have committed overt acts toward that end. LaFave & Scott, *supra.*

Thus, it is the holding of this court that the Wharton Rule does not apply in cases where the substantive offense requiring concerted activity has not been completed.

*Exclusion of Certain Evidence.*

The State argues that the trial court unduly restricted the evidence admitted in the State's cases by refusing to allow testimony regarding the stop and search of Lee Clason's truck in Harlan County and that two small bags with crank residue were found in the process of that search. The initial question is whether the State preserved this possible error during the trial. Neb. Rev. Stat. § 27-103 (Reissue 1989) provides in significant part:

(1) Error may not be predicated upon a ruling which . . . excludes evidence unless a substantial right of the party is affected, and:

. . . .

(b) In case the ruling is one excluding evidence, the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked.

There is a great deal of discussion about the admissibility of certain evidence in connection with the arrest of Lee Clason in Harlan County, but no questions were asked and no offer was made. We can study the record and perhaps surmise what the evidence would have been, but that is all.

Furthermore, the issue of the admissibility of this evidence turns upon whether the evidence is relevant under Neb. Rev. Stat. § 27-402 (Reissue 1989) or whether its probative value is

outweighed by undue prejudice, confusion of the issues, or misleading the jury, etc. The determination of the admissibility of such evidence is within the discretion of the trial court and will not be reversed absent an abuse of that discretion. *State v. Christian*, 237 Neb. 294, 465 N.W.2d 756 (1991); *State v. Owen*, 1 Neb. App. 1060, 510 N.W.2d 503 (1993).

The State bases its argument on the general proposition that the trial court must allow great latitude in the receipt of evidence in conspiracy cases. With no offer of proof, and in the context of these appeals, we conclude that consideration of this evidentiary question would not be helpful, and we do not consider it.

## CONCLUSION

We conclude that the district court should not have granted the defendants' motion to dismiss.

EXCEPTION SUSTAINED.